**STATE of Iowa, Appellant,**

v.

**Robert Charles STEADMAN, Appellee.**

**No. 84–03.**

Supreme Court of Iowa.

June 6, 1984.

Thomas J. Miller, Atty. Gen., Lona Hansen, Asst. Atty. Gen., and Denver D. Dillard, County Atty., for appellant.

Ted V. Ruffin and E. David Wright, Cedar Rapids, for appellee.

McCORMICK, Justice.

We granted discretionary review of a trial court order suppressing the results of a breath-alcohol test administered to defendant Robert Charles Steadman pursuant to the implied consent procedures in Iowa Code chapter 321B (1981). Defendant challenged the admissibility of the test result in consolidated prosecutions for operating a motor vehicle while intoxicated (OWI) in violation of section 321.281 and for involuntary manslaughter in violation of section 707.5. The challenge was grounded on the State's failure to preserve a sample of defendant's breath for independent testing. In sustaining defendant's motion, the trial

court held that the State was required by the court's decision in *State v. Brown*, 337 N.W.2d 507 (Iowa 1983), to preserve a breath sample for defendant's subsequent testing and analysis. Because we hold that evidence of chemical test results obtained through chapter 321B implied consent procedures are not subject to suppression under the *Brown* decision, we reverse and remand.

The charges arose from an accident that occurred in Cedar Rapids on December 29, 1982, when an automobile driven by defendant struck and killed a pedestrian. An investigating police officer put defendant through several field sobriety tests. Defendant performed poorly on those tests and also flunked a field alcosensor test. The officer arrested him for OWI and transported him to the county jail.

At the jail, the officer invoked implied consent procedures. Defendant consented to furnish a breath specimen, and a deputy sheriff administered a breath test using an Intoxilizer Model 4011A. The intoxilizer records the alcohol content of deep lung air and purges the sample into the atmosphere at the completion of a three-stage testing cycle. The device performs a calculation based on a fixed ratio of alcohol in lung air to alcohol in the blood and reports the result as a blood alcohol reading. In this case the test showed a blood alcohol level of .143 percent by weight. Defendant was not advised of his right to have an independent chemical test, and he did not notify the officers of his desire to have one.

The General Assembly has expressly provided for admissibility of chapter 321B test results in any civil or criminal action "arising out of acts alleged to have been committed by any person while operating a motor vehicle in violation of section 321.-281." Iowa Code § 321B.28 (1983). It has also specifically addressed the admissibility issue when the defendant does not obtain an independent test:

> The person may have an independent chemical test or tests administered in addition to any administered at the direction of a peace officer. The failure or inability of the person to obtain an independent chemical test or tests does not preclude the admission in evidence of the results of the test or tests taken at the direction of the peace officer.

§ 321B.15 (§ 321.4 in the 1981 Code). No basis exists in these provisions for creating an affirmative duty in the officer to preserve or offer to preserve a sample of the specimen tested when the defendant does not notify the officer of a desire for an independent test. At issue here is whether this affirmative duty is nevertheless imposed on the officer by a defendant's constitutional right to due process. If this duty exists, we do not believe it depends on the device or method employed by the State to test the defendant's blood alcohol level in a particular case. We assume without deciding that the defendant in this case sufficiently invoked his rights under the due process clause in article I, section 9 of the Iowa Constitution and the fourteenth amendment of the United States Constitution.

The *Brown* case, relied on by the trial court in suppressing the test result, was an involuntary manslaughter prosecution in which suppression of blood alcohol test results was upheld on due process grounds because of the State's failure to preserve a blood specimen in unusual circumstances. Implied consent procedures were not employed in *Brown*. The defendant had not been placed under arrest, and the officer did not believe he had probable cause to charge the defendant with OMVUI. 337 N.W.2d at 508. The officer requested a blood sample for alleged "medical" rather than "legal" purposes, and the rigorous foundational requirements of chapter 321B were not followed. *Id.* By obtaining the evidence outside chapter 321B, the State deprived the defendant of the protections afforded by the adversary implied consent procedures.

Undergirding *Brown* was a recognition of the built-in safeguards in chapter 321B. In imposing the duty to preserve a sample for independent testing in the circumstances disclosed by the record in that case, the

court distinguished chapter 321B procedures:

> The chapter 321B procedures were adopted to protect the integrity of the enforcement process and the interests of the State and defendant. While we find no evidence of manipulation in this instance, it would be imprudent to open the door to wholesale frustration of the legislature's intent.

337 N.W.2d at 512.

This court compared and contrasted the foundational requirements of chapter 321B with general foundational requirements for admissibility of intoxication test results in *Henkel v. Heri*, 274 N.W.2d 317, 319–22 (Iowa 1979). The court has recognized that an important purpose of the stringent chapter 321B requirements is to guarantee the reliability and accuracy of test results. *See State v. Schlemme*, 301 N.W.2d 721, 723 (Iowa 1981). Exclusion of test results has been mandated when chapter 321B requirements affecting test reliability and accuracy have not been satisfied. *See, e.g., State v. DeBerg*, 288 N.W.2d 348, 350 (Iowa 1980) (failure to show syringes and needles were factory wrapped and disposable); *State v. Smith*, 272 N.W.2d 859, 860–62 (Iowa 1978) (absence of testimony showing effect of anti-coagulant); *State v. Richards*, 229 N.W.2d 229, 233–34 (Iowa 1975) (absence of showing of timely written request of defendant); *State v. Wallin*, 195 N.W.2d 95, 98 (Iowa 1972) (absence of written request and failure of syringe and needle to meet statutory requirements); *State v. Shelton*, 176 N.W.2d 159, 161 (Iowa 1970) (failure to show nurse had been designated by licensed physician to withdraw blood and to establish use of syringe required by statute).

In addition to imposing unique foundation requirements in implied consent cases by statute, the legislature has delegated to the commissioner of public safety the responsibility to approve devices and methods used to obtain a specimen of breath or urine. § 321B.15. In carrying out this responsibility, the commissioner has approved the intoxilyzer 4011A and requires

that the operator "shall proceed in accordance with the instructions contained in the operator's manual for such device, or instructions furnished by the Iowa department of public safety criminalistic laboratory...." 680 I.A.C. 7.2(1). We have given the laboratory checklist procedures the same force and effect as the statutory foundation requirements. *See State v. Hershey*, 348 N.W.2d 1 (Iowa 1984) (requirement that subject be observed to assure no smoking, eating or drinking for 15 minutes before breath test is administered).

The test result in *Brown* was not accompanied by the assurances of reliability and accuracy provided when implied consent procedures are used. This did not alone make the evidence inadmissible because chapter 321B authorizes the introduction of evidence of intoxication from sources other than tests conducted pursuant to chapter 321B. *See* § 321B.36. The holding in *Brown* was designed to protect the defendant in view of the lesser assurance of reliability and accuracy of test results when chapter 321B procedures are not employed. Those procedures strike a balance between the public interest in effective and efficient law enforcement and the rights of the individual. They are calculated to promote the reliability and accuracy of the State's chemical test while providing the defendant with the right to have an independent test if the defendant chooses. The fact that the General Assembly might have stricken the balance differently by imposing an affirmative duty on the officer to preserve or offer to preserve a sample for testing in every case or in some cases does not make the statutory procedures fundamentally unfair.

 Under *Brown* a defendant establishes a due process violation based on the State's failure to preserve a sample for testing when the defendant shows (1) a proper request for the evidence, (2) its materiality in the constitutional sense, and (3) an unavoidable possibility the destroyed evidence would be favorable to the defendant. *See* 337 N.W.2d at 509. The second and third prongs of the *Brown* inquiry are inapposite in the context of chapter 321B tests.

The statutory assurances of reliability and accuracy negate the per se materiality of the sample in the constitutional sense and nullify any "unavoidable possibility" that a preserved sample would produce a test result favorable to the accused. Suppression is warranted on due process grounds in chapter 321B cases if a sufficient showing is made under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but not under the expansive interpretation of *Brady* in such cases as *Garcia v. District Court, 21st Judicial District*, 197 Colo. 38, 589 P.2d 924 (1979).[1] *See Brown*, 337 N.W.2d at 510.

Our conclusion is like that of the Kansas court in *State v. Young*, 228 Kan. 355, 362–63, 614 P.2d 441, 446–47 (1980):

> In Kansas we believe the statutes . . . provide proper safeguards to assure reasonably accurate test results and to enable the accused, on request, to secure any additional chemical test by a physician of his or her own choosing, which the accused may desire. . . .

> Under the safeguards built into [the Kansas implied consent statute], the failure of the State to automatically furnish an accused with a sample of his own breath for independent testing is not a denial of due process.

Lack of an independent test does not leave a defendant defenseless. Drunk driving cases have been defended successfully for years through use of traditional trial resources including cross-examination and extrinsic evidence that cast doubt on the reliability and accuracy of particular test results. Extrinsic evidence on the issue was adduced in the suppression hearing in this case. Machine accuracy, testing procedures and compliance with foundational requirements are always open to question. *See generally* Imwinkelried, *A New Era in the Evolution of Scientific Evidence—a Primer on Evaluating the Weight of Scientific Evidence*, 23 Wm. & Mary L.Rev.

261 (1981). The evidence is powerful but not conclusive.

■ We hold that the due process clauses of the state and federal constitutions do not require suppression of blood alcohol test results obtained through chapter 321B implied consent procedures for failure of a peace officer to preserve a sample of the specimen tested when the defendant did not notify the officer of a desire for an independent test.

■ In the present case, no suggestion exists that chapter 321B procedures were not satisfied, and no due process violation under the *Brady* standard has been established. Suppression was ordered solely on the theory that the State is required under *Brown* to preserve a sample for independent testing in all cases. Because *Brown* does not apply in implied consent cases and no other basis for suppression has been demonstrated, the suppression order is reversed and the case remanded for further proceedings.

REVERSED AND REMANDED.

All Justices concur except SCHULTZ, J., and REYNOLDSON, C.J., who concur specially and CARTER and WOLLE, JJ., who dissent.

SCHULTZ, Justice (concurring specially).

Although I agree with the majority that Steadman's test results should not have been suppressed, I reach this result after applying the legal test announced in *Brown. Id.* 337 N.W.2d at 511. I do not agree that *Brown* is inapplicable in implied consent cases. Rather, I conclude *Brown* applies in any case where the acquisition and preservation of a sample for independent testing by a defendant is material to his defense and there is a reasonable probability it would be favorable to him.

1. Cases following *Garcia* include *Municipality of Anchorage v. Serrano*, 649 P.2d 256 (Ct.App. Alaska 1982); *Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1979); *People v. Trombetta*, 142 Cal. App.3d 138, 190 Cal.Rptr. 319 (1983), *cert. grant*-ed, —— U.S. ——, 104 S.Ct. 696, 79 L.Ed.2d 163 (1984). Contrary holdings include *State v. Young*, 228 Kan. 355, 614 P.2d 441 (1980); *Montoya v. Metropolitan Court*, 98 N.M. 616, 651 P.2d 1260 (1982).

While implied consent procedures undoubtedly lessen the chance for errors, machines and humans are fallible. Moreover, these procedures do little more than require probable cause for an arrest, the use of testing devices and methods approved by the commissioner of public safety and, in the case of a blood test, place restrictions on who may take the sample and what kind of withdrawal device may be used.

Conversely, the department only requires the intoxilyzer to be calibrated annually, does not provide for any quality control in each testing event and does not even require more than one sampling and testing of a defendant's breath. Additionally, the testing device is nonspecific for alcohol raising the possibility that the test results could be erroneously inflated by contamination from other hydrocarbons that absorb light at the wavelength used to detect alcohol. Finally, potential errors may also result from the internal computation process. Although the instrument measures the amount of alcohol in deep-lung air, the result is converted to blood alcohol content by multiplying the breath result by 2100 (this calculation is based on a fixed ratio of alcohol in lung air to that in blood). Thus, any slight contamination or error in the breath analysis would be considerably magnified by the subsequent computation.

The seriousness of these problems is compounded by the fact that a blood alcohol of .13 standing alone is sufficient for conviction under section 321.281(1)(b), and a reading of .10 raises a presumption that a defendant was driving while impaired in violation of section 321.281(1)(a). Moreover, the State has no obligation to inform defendant of his statutory right to an independent test, making this right largely illusory since he cannot exercise a right he does not know about and cannot complain about the State's failure to tell him.

For all these reasons, I cannot join the majority's reasoning that compliance with Chapter 321B procedures adequately protects a defendant in every case and effectively forecloses a due process challenge to the results of a state-administered test.

Contrary to the holding of the trial court, I would hold that Steadman's due process rights were not violated. Under the record, there was not an unavoidable possibility that the acquisition and preservation of a sample for later testing by Steadman would have been favorable to him. Thus, I join the result reached by the majority.

REYNOLDSON, C.J., joins this special concurrence.

CARTER, Justice (dissenting).

I dissent. I believe the district court's order suppressing the chemical test results in the present case is consistent with the result which we approved in *State v. Brown*, 337 N.W.2d 507 (Iowa 1983). The same features of fundamental fairness in the adversary process are involved in both cases.

In arriving at our result in *Brown*, we relied, in part, on decisions of courts in other states which have refused to allow evidence of chemical tests for blood alcohol conducted by law enforcement officers who have merely recorded the test results and failed to preserve the specimens which had been tested. It has been observed that this procedure has the effect of forcing the defendant and the courts and juries who are charged with deciding the cases to accept the prosecution's analysis at face value without any means of independent verification. At least three of the cases condemning this practice which were relied on in *Brown* are decisions involving failure to preserve breath samples. These include: *Lauderdale v. State*, 548 P.2d 376, 382 (Alaska 1976); *People v. Hitch*, 12 Cal.3d 641, 649–51, 527 P.2d 361, 367–69, 117 Cal. Rptr. 9, 14–16 (1974); and *Garcia v. District Court, Twenty-First Judicial District*, 197 Colo. 38, 46–47, 589 P.2d 924, 929–30 (1979).

A review of our decision in *Brown* leads to the conclusion that the holding of the case is derived from principles of fundamental fairness which we independently concluded were required to satisfy due process. Although federal court decisions

were discussed in *Brown,* those decisions were deemed to be pertinent rather than controlling. Reference made in *Brown* to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), does not suggest that the decision controlled the issue presented. When this court acts in this manner, I believe we are, necessarily, interpreting state constitutional law because of our own constitutional role. Stated somewhat differently, what we deem to be required by due process, based on our sense of fundamental fairness, becomes the test of due process under article I, section 9 of the Iowa Constitution.

Similarly, I believe those state court decisions [1] which have suppressed evidence of chemical blood alcohol tests when the authorities have failed to preserve the specimen have also been prompted by these same principles of fundamental fairness rather than an applied analysis of federal law under *Brady.*

As a point of beginning, it must be noted that the State seeks to use the intoxilyzer results as scientific evidence. This is a misrepresentation of its real character. In the present case, a biochemist testified that verifiability of the results of a chemical test is a condition precedent to scientific acceptance of the test results.[2]

The State seeks to deal with this problem by asserting that tests conducted on an Intoxilyzer Model 4011A have proven to be accurate when the devices have been tested by analyzing samples of known chemical composition. This argument completely misses the point. What is at issue in these cases is not the accuracy of the Intoxilyzer Model 4011A generally, or in selected cases, but the accused's entitlement to check upon the accuracy of the analysis in his or her own particular case. Defendant's expert witness indicated that testing the machine with samples of known blood

alcohol content only establishes the accuracy of the unit in testing that sample. In contrast, the accuracy of an analysis of a sample of breath where the blood alcohol content is unknown can only be assured by a second testing of the same sample or a contemporaneously conducted chemical test of another type on the same subject. Under the procedure which the majority approves, there is no way in which this can be done.

In cases where the issue of whether an accused was driving is not an issue, this circumstance will permit the ultimate determination of guilt to be made by a machine conducted by an operator trained only in the mechanical requirements of its use and unfamiliar with the scientific principles underlying its operation. I submit that such a procedure is fundamentally unfair, and the State should not be permitted to use the test results.

Contrary to the position adopted by the majority, there are no guarantees of reliability and accuracy contained in the State's procedure which overcomes the unfairness of the foregoing procedure. Nor does an accused have a meaningful opportunity to secure an independent test on his own initiative. When pressed in oral argument to delineate the extent of the State's obligation to aid an arrested person in securing an independent chemical test, counsel for the State in the present case responded that the State's obligation is merely not to interfere with the person's efforts to secure such a test.

At the suppression hearing in the present case, a deputy sheriff testified that the policy at the jail where defendant was incarcerated at the time the chapter 321B procedures were invoked was to advise persons who requested an independent test

---

1. In addition to those state court decisions involving breath analysis which were cited in *Brown,* similar results have been reached in *Municipality of Anchorage v. Serrano,* 649 P.2d 256 (Alaska App.1982) and *Baca v. Smith,* 124 Ariz. 353, 604 P.2d 617 (1979).

2. The record reflects that the manufacturers of other types of breath testing devices have recognized this requirement, not as an aspect of fairness to the accused, but as an element of scientific reliability of test. These devices have an extra chamber to preserve a sample for subsequent testing.

that "it would be up to them to obtain a doctor to come to the jail to administer it."

The chapter 321B procedures in the present case were conducted at 3:00 a.m. I believe we may take judicial notice of the fact that most arrests for operating under the influence take place when medical facilities are either closed or operated with skeleton staffs. The defendant in the present case had no reasonable likelihood at the time indicated of securing a licensed physician or physician's assistant to come to the county jail within the limited time a meaningful test sample could be obtained.

If the extent of the State's obligation is as it contends, merely not to interfere with a defendant's efforts, this case is no different from *Brown*. Surely, the State had no right to interfere with the defendant in *Brown* had he asked the hospital personnel to perform a second blood test. The only meaningful distinction is that had both the defendant in *Brown* and the defendant in the present case sought to obtain independent chemical tests, only the defendant in *Brown* would have had any meaningful opportunity to obtain one. I would affirm the district court.

WOLLE, J., joins this dissent.