STATE of Iowa, Appellee,

v.

Lewis J. ATLEY a/k/a Gary J. Semeniuk, Appellant.

No. 95–1133.

Supreme Court of Iowa.

June 18, 1997.

Michael K. Williams, Souix City, for appellant.

Lewis J. Atley, pro se, on rehearing.

Thomas J. Miller, Attorney General, Robert P. Ewald, Assistant Attorney General, William E. Davis, County Attorney, and Realff H. Ottesen, Assistant County Attorney, for appellee.

SNELL, Justice.

This case involves an appeal by defendant, Lewis J. Atley, who was convicted of manufacturing and possessing controlled substances, possession with intent to deliver controlled substances, and tax stamp violations. He asserts trial court errors and that the statute relating to psilocybin is unconstitutional. We are now reconsidering issues raised by defendant's petition for rehearing, which we granted, as well as those issues previously considered. On rehearing, we affirm.

I.   Factual and Procedural Background

On July 11, 1994, Davenport authorities were notified by the Denver, Colorado police that a package containing methamphetamine had been intercepted at the Denver airport and would be arriving that afternoon at the Quad City airport. Officers of the Quad–City Metropolitan Enforcement Group (MEG) set up surveillance at the airport and observed the defendant pick up the package. The officers followed Atley's vehicle into Iowa and eventually stopped it along the interstate. Officers questioned him about the package and found that it did contain methamphetamine. Atley was Mirandized but not arrested. After a brief conversation, police obtained consent from Atley to search his home. Atley informed the officers that there they would find a small quantity of marijuana and something else that would "make front page news."

Upon arriving at Atley's residence, officers found it had been converted into a large mushroom growing operation. Inside were mushrooms in various stages of growth, over

4000 mason jars, 2000 styrofoam coolers, 240 petri dishes, four 50–pound bags of brown rice, and numerous other instruments of mushroom production, including refrigerators, humidifiers, grow lights, pressure cookers, heat sealers, and packaging materials. Police also found a quantity of marijuana at the residence. Atley told the police that he did not believe his operation was illegal, and at the same time stated that he could sell the mushrooms for $800 per pound.

Atley initially was not arrested and subsequently entered into an agreement with the police to serve as an informant. But after a few days, Atley and his wife could not be located. Police then obtained and executed several search warrants at post office boxes and at Atley's residence. Pursuant to these warrants, officers seized property and funds believed to be proceeds of an illegal mushroom growing operation. A random sampling of mushroom material taken from the mason jars and petri dishes tested positive for psilocybin, a controlled substance, by the Iowa Division of Criminal Investigation. The remaining organic material seized from the residence, including the untested mushrooms and mycelia, was subsequently destroyed when officers believed that its decomposition posed a health hazard.

Atley was eventually located and arrested in Florida in October 1994. On October 28, 1994, he was charged by trial information with: manufacture of a controlled substance (psilocybin) in violation of Iowa Code section 124.401(1)(c)(6) (1993), possession of a controlled substance with the intent to deliver (psilocybin) in violation of section 124.401(1)(b), failure to affix a tax stamp (psilocybin) in violation of section 453B.12, possession with the intent to deliver (cannabis) in violation of section 124.401(1)(d), failure to affix a tax stamp (cannabis) in violation of section 453B.12, and possession of a controlled substance (methamphetamine) in violation of section 124.401(3).

A forfeiture hearing was also held, which resulted in the forfeiture of money and other personal property found to be proceeds of illegal drug sales. Atley represented himself at this hearing.

Prior to trial of the criminal charges, court-appointed attorneys were appointed to represent Atley. They performed their responsibilities as his counsel and Atley filed and argued numerous motions pro se. At trial, a jury returned guilty verdicts on all counts. Atley filed a motion for new trial, which was denied by the district court. He now appeals the jury verdicts, the denial of the new trial motion, and other aspects of the charges against him.

II. Procedural Issues

A. Uniform Criminal Jury Instruction No. 200.40

At trial, the jury was given Uniform Criminal Jury Instruction 200.40, which stated that the defendant's exercise of his right to not be a witness on his own behalf shall not be considered by the jury for any purpose. Atley argues that the court erred in submitting this instruction, contending that he never requested it, as required by *State v. Kimball*, 176 N.W.2d 864, 869 (Iowa 1970).

■ Our review of the submission of a jury instruction is for corrections of errors of law. Iowa R.App. P. 4; *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996).

We have set forth the necessary prerequisites for submitting instruction number 200.40. In *Kimball*, we held that

such instruction should not be given in any future trial unless it is requested by defendant, and that it will be considered error if it is given, absent such request, in any trial started after the date this opinion is filed.

*Kimball*, 176 N.W.2d at 869.

■ The record, however, does indicate that the defendant affirmatively requested this instruction. After the jury left to deliberate, a brief record was made concerning this issue:

THE COURT: For purposes of the record—I've sent the jury from the room—included in the instructions sent with them was Instruction No. 33, regarding defendant's decision not to testify.

I just need to clarify this for the record. Mr. Weinberg, this was included at your client's request, is that right?

MR. WEINBERG: Oh, yes; sure.

THE COURT: We didn't put that on the record before.

MR. WEINBERG: It's because it was already included.

Because the record shows Atley requested this instruction, there was no error in submitting it to the jury. The fact that the record was made after the jury began to deliberate is non-consequential. In addition, there is testimony from Atley where he acknowledges that he chose not to testify on his own behalf. Thus, we find that the record sufficiently meets the requirement of *Kimball* and that Atley was not prejudiced by the submission of this instruction to the jury.

## B. Motion for New Trial

■ Atley also claims error in the trial court's refusal to grant a new trial, based on numerous alleged errors occurring during the course of the proceedings. Trial courts have broad discretion in passing on motions for new trial. *Thompson v. Rozeboom,* 272 N.W.2d 444, 446 (Iowa 1978); *Fleener v. Board of Supervisors,* 246 N.W.2d 335, 338 (Iowa 1976). We review a denial of a motion for new trial for abuse of discretion. *Bredberg v. Pepsico, Inc.,* 551 N.W.2d 321, 326 (Iowa 1996). In order to show an abuse of discretion, one generally must show the court exercised its discretion " 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' " *State v. Blackwell,* 238 N.W.2d 131, 138 (Iowa 1976) (quoting *Weeks v. Burnor,* 132 Vt. 603, 326 A.2d 138, 140 (1974)).

At trial, Atley moved to dismiss counts I, II, and III (relating to psilocybin), based on the State's destruction of much of the evidence it had seized. Atley claimed such destruction was violative of his due process rights. This motion was denied and after the jury returned guilty verdicts on all counts, Atley, both through his counsel and pro se, sought a new trial on the grounds that the court erred in failing to dismiss the charges against him. He argued that the destruction of evidence by the State warranted dismissal and that the court failed to properly instruct the jury on spoliation. We do not find that the trial court abused its discretion in denying these motions.

■ Failure of the State to preserve potentially useful evidence does not constitute a denial of due process unless the defendant can show bad faith. *Whitsel v. State,* 525 N.W.2d 860, 864 (Iowa 1994); *State v. Dulaney,* 493 N.W.2d 787, 791 (Iowa 1992). Bad faith destruction of exculpatory evidence is commonly referred to as spoliation. *State v. Langlet,* 283 N.W.2d 330, 333 (Iowa 1979) ("Spoliation involves more than destruction of evidence. Application of the concept requires an intentional act of destruction."). We have further noted:

> Where the lost evidence is only *potentially* exculpatory, where by its nature the lost evidence cannot be evaluated by a fact finder, a due process violation will not be found in the absence of a showing of bad faith.... [I]f the exculpatory value of the lost evidence is suitable for evaluation by a fact finder, a due process violation will be found upon a showing that the evidence was exculpatory and its destruction was deliberate.

*State v. Craig,* 490 N.W.2d 795, 796–97 (Iowa 1992) (footnote omitted).

■ We agree with the trial court that the evidence destroyed was neither exculpatory nor destroyed in bad faith. The trial court considered the facts and circumstances and refused to instruct the jury as to "destruction of the evidence." In its ruling, the district court listed a large number of "extraordinary circumstances" which justified the officers' destruction of some of the evidence. Included in these circumstances was the "sheer quantity" (over 4000 mason jars and petri dishes of organic material) of evidence, its perishability, and that there was insufficient space to store it. Furthermore, there was testimony that as the mushrooms began to decompose, officers noticed a strong odor and believed that it may have been toxic. One officer testified that the decomposition already had begun to adversely affect the health of those in the office, especially asthmatics and allergy sufferers. Although the State failed to obtain a court order before destroying the evidence, we nevertheless do not find that this rises to the level of bad

faith such that Atley's due process rights were violated or that a new trial was required. These circumstances certainly provide a reasonable basis for the trial court's decision.

■ Atley also claims error in that only a random sampling of the evidence was tested, and not all of the material found in each jar and petri dish. But significantly, the State did preserve those samples which were actually tested and Atley had access to them. He had an opportunity to challenge the sampling and testing procedures if he wished to attack the credibility of the laboratory results. Atley attempts to bolster his claim by contending his growing operation was for medical and scientific purposes and that if all the evidence had been tested, it would have been found that some of the mushrooms were not of the psilocybe variety. But the fact that some of the untested mushrooms may not have been psilocybe, and consequently legal to possess, does not alter the underlying illegality of possessing those mushrooms which were found to contain psilocybin.

A due process violation can only be established if there exists "an unavoidable possibility the destroyed evidence would be favorable to the defendant." *State v. Steadman*, 350 N.W.2d 172, 174 (Iowa 1984). There is not such a possibility in this case. The fact that one of the samples tested positive for psilocybin is sufficient for conviction under section 124.401(1). Whether the other samples tested positive for psilocybin is immaterial.

■ Finally, in regard to Atley's argument that the court erred in not instructing the jury on spoliation, we note that such an instruction is only appropriate when such destruction is a violation of a defendant's due process rights. *Langlet*, 283 N.W.2d at 333.

### III. Constitutional Issues

### A. Procedural Background

### 1. Motion for Continuance

Atley claims the trial court's refusal to grant a continuance constituted reversible error. The sequence of events leading to the court's ruling was as follows:

On October 28, 1994, the prosecutor filed a six count indictment against Atley. Attorney J.E. Tobey, III was appointed to represent Atley.

On November 16, 1994, Tobey filed a motion to withdraw, stating that he was uncomfortable representing Atley because Atley insisted on acting as co-counsel. The court granted the motion and appointed attorney Carroll J. Walker to represent Atley.

On January 27, 1995, Atley asked that Walker be replaced. The district court granted the request, noting "it appears all communication between defendant and counsel had broken down." The court then appointed attorney Robert Weinberg to represent Atley. On the same day, Atley filed a waiver of his right to a speedy trial.

On February 24, 1995, the court granted a motion by Atley to continue the suppression hearing set for that date. The court also ordered the trial continued until May 1, 1995. Atley filed a second speedy trial waiver.

On March 27, 1995, the court granted Atley's request to continue the scheduled hearing on pending motions.

On April 21, 1995, a pretrial conference was held. The trial was scheduled for June 5, 1995.

On June 1, 1995, attorney Robert Weinberg learned he had been hired to replace Hugh Pries at the Scott County Attorney's office on or about June 15. Pries handled a large number of the drug cases for the county attorney's office and had close relationships with the MEG officers, who were to be the main witnesses in Atley's case. Weinberg disclosed these facts to Atley. At that same time, a plea bargain was in place and was being considered by Atley. Weinberg believed that with a full disclosure of the situation to Atley, the case would be resolved if he accepted the plea bargain. If not, Weinberg felt that he could not adequately and effectively represent Atley, given the potentiality of a conflict of interests.

On June 2, 1995, Weinberg filed a motion to withdraw as counsel of record citing ethical and disciplinary rules, and constitutional concerns. Atley also filed a motion for re-

moval of counsel and phoned a threat to Weinberg that he would ask the Iowa Supreme Court to sanction him.

On June 5, 1995, the court heard arguments on the motion to withdraw as counsel. Weinberg argued his concerns about conflicts of interests. He also stated additional reasons for his motion, stating the following:

Mr. Atley also has filed some other motions recently, where he raises questions about things that I've done or failed to do. He has waived speedy trial. I think, as is his right, he would like to rescind the waiver, which I advised him would give him another ninety days, but at this point he has waived a speedy trial. I think he would be entitled to reasonable time to prepare for trial with new counsel. I took depositions in this case. We had basic pretrial motions that are important to how the case will go forward, such as a motion to suppress and a basic motion to dismiss, based on constitutional objections to the institution of the prosecution.

I feel that there has been adequate preparation taken so that an additional—a new attorney would just clean up those items that Mr. Atley had wished to pursue prior to a trial, but I think under all the circumstances—just to be quite candid with the court, I just feel that I'm put in a very difficult position, in terms of what the canons of ethics require.

Mr. Atley, I think, as shown from the record, is a fairly difficult person to deal with. I've had rapport with him; however, on my answering machine this morning was a—you know threat to ask the Supreme Court to take sanctions against me, which after I talked to him last night—I mean—I had no inkling about, but—you know, I got different signals from him. I just think that there's such a breach in the attorney/client relationship that I could not be effective, and I think the outcome of this case is likely to be such that the fact of my having pursued a trial under these circumstances would raise serious questions about whether or not any future conviction would stand, that I have—I have that concern also.

The State responded as follows:

THE COURT: Does the State have anything it wishes to add?

MR. OTTESEN: Yes, Your Honor. I have reviewed Canon 5, which states a lawyer should exercise independent professional judgment on behalf of a client, have also reviewed the ethical considerations in the disciplinary rules under that canon, and I concur with Mr. Weinberg in the conclusions that he has drawn from them.

The State is in a very difficult position in this case, in raising—in making a specific statement or a specific claim, since Mr. Weinberg is going to be, in the near future, working with us. Most of the cases and opinions that have dealt with changes of employment by lawyers have opted in favor of the client being given the rights, and not deprived of them, and I think that clearly, in this case, forcing this matter to trial today would be going against the general grain of those opinions.

The court then stated its ruling and reasons for it:

THE COURT: The Court has heard the arguments of counsel today and has considered this question since last week, also having reviewed the canons and the ethical considerations. The Court finds that this motion to withdraw as counsel should be overruled and denied, and is doing so.

In this case, the Court can find that, while Mr. Weinberg is going to work at the County Attorney's Office on June 15 and did learn that would be the case on June 1, he has represented this client zealously throughout the pendency of these proceedings and has done a number of things on behalf of this client to prepare for trial today. The Court is not advised of any information that Mr. Weinberg has worked with the MEG officers or not worked with the MEG officers, and also notes that, in this community, our court-appointed attorneys, our defense bar, are people who, with some frequency, do become a county attorney for some period of time, and I am aware of no rule, nor any policy, that says when one goes from the defense bar to the prosecution that there must be a period of so many days, weeks or months, in which

one cannot represent defense clients. And the same is true on the other end, we often have county attorneys who leave the County Attorney's Office and do criminal defense, and, again, I am not aware of any policy or rule or case which states that there must be so many days, weeks or months in which those people have to make transitions from being a prosecutor to a defense counsel.

In this district, I can also point out we also have the scenario where we have part-time magistrates. Several of our part-time magistrates, who serve one day a week in a judicial capacity, also serve on our criminal court appointment list, and are able to change their hats, and we have not raised that as a difficulty.

In this case, Mr. Weinberg has not changed his hat yet, he will on June 15, and my personal acquaintance with Mr. Weinberg and his abilities as an attorney is that he will be one hundred percent professional and zealous on behalf of his client in this matter, and when he goes to the County Attorney's Office on June 15 he will be one hundred percent zealous in that role also.

I can appreciate the fact that the spot which Mr. Weinberg is taking will be one in which he will work frequently with the MEG officers, and—I think that the MEG officers, in addition to the prosecutors and the defense bar, all get along well and understand each other's roles, and will be not inclined to testify any differently at this trial than they would be otherwise, nor will they treat Mr. Weinberg any differently after June 15, when he changes hats.

I think Mr. Weinberg has demonstrated his competency and his experience as an attorney, and, in fact, I'm sure that's why the County Attorney's Office has offered him a job, to start June 15, is that he is a competent and experienced attorney, and that he will zealously represent the State, just as he presently zealously represents the defendant.

I know the concerns that are raised that this client has stated in his own motions, that his—he feels that he cannot be properly represented by an attorney who's go-ing to the County Attorney's Office, and that he desires to have a different attorney. However, I don't give that a huge amount of weight, because Mr. Atley is on his third attorney at this time, and there have been other issues which have caused Mr. Atley to request attorneys, and, frankly, this case has been pending since November, and it appears to me that—perhaps this is an unknown to me, what the reason would be for this, but it appears to be some sort of a way to delay the proceedings, and the Court is not going to buy into that.

The Court will merely state that Mr. Weinberg will be expected to provide Mr. Atley with his usual high quality of representation and be zealous in his representation.

The motions that are presented here today—I'm sure Mr. Weinberg is ready to proceed, and I'm also sure that, with regard to the case that's set to begin today, Mr. Weinberg will do an excellent job in representing Mr. Atley's interests at the trial.

The motion for continuance, based on the motions to disqualify Weinberg as counsel, was subsequently denied.

### 2. Other Procedural Motions

Following the denial of the motion for a continuance, the court heard arguments and ruled on numerous other motions filed by Weinberg and by Atley, pro se. These included a petition for writ of habeas corpus, a motion for pretrial release, a motion for change of venue for judicial misconduct, and a motion by Atley to be appointed legal assistant to prepare exhibits and prepare a defense. Atley also filed motions to dismiss based on an insufficient quantity of mushrooms for the charged offense, absence of legislative intent to control psilocybe mushrooms, and judicial misconduct. Atley also filed a motion to rehear the ruling on suppression of evidence, motions for preservation of samples and funds for independent testing, motions for funds and expenses for expert and material witnesses, a motion to allow Atley access to the Scott County law library, motions to photocopy, photograph

and examine evidence, a motion to order the county jailer to provide Atley with pen and paper, and a motion to rescind Atley's waiver of speedy trial. Atley also raised constitutional issues, including an alleged violation of freedom of religion, double jeopardy, and a violation of immunity in providing information during plea bargaining.

The court took up each of these motions, heard arguments by Weinberg, Atley and the prosecutor, stated reasons for the court's rulings, and ruled on the motions.

B. Sixth Amendment

1. Overview

In resolving Atley's Sixth Amendment claim, it is helpful to consider the development of case law on this issue. In *United States v. Horton*, the Seventh Circuit Court outlined law established under the Sixth Amendment:

> Normally, a defendant alleging ineffective assistance of counsel under the Sixth Amendment must show not only that his counsel's performance fell below minimum professional standards, but also that his counsel's failure was so prejudicial that it probably changed the outcome of his trial. *Strickland v. Washington*, 466 U.S. 668, 691–96, 104 S.Ct. 2052, 2066–69, 80 L.Ed.2d 674 (1984); *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1312 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987). Where a conflict of interest provides the predicate for an ineffective assistance claim, however, a defendant bears a lighter burden with regard to demonstrating prejudice. *Walberg v. Israel*, 766 F.2d 1071, 1075 (7th Cir.1985), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *United States v. Marrera*, 768 F.2d 201, 205 (7th Cir.1985), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986). If a defendant or his attorney gives the trial court notice of the alleged conflict and the trial court fails to inquire into the conflict, a reviewing court will presume prejudice upon a showing of possible prejudice. *Holloway v. Arkansas*, 435 U.S. 475, 484–91, 98 S.Ct. 1173, 1178–82, 55 L.Ed.2d 426 (1978); *Walberg*, 766 F.2d at 1075; *Marrera*, 768 F.2d at 205. If however, the trial court has not been given notice of the alleged conflict, the defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348–49, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980); *Marrera*, 768 F.2d at 205–06; *Walberg*, 766 F.2d at 1075.

*United States v. Horton*, 845 F.2d 1414, 1418 (7th Cir.1988).

In *Wood v. Georgia*, the defendants were represented by a lawyer who was hired by and represented their employer. *Wood v. Georgia*, 450 U.S. 261, 266, 101 S.Ct. 1097, 1101, 67 L.Ed.2d 220, 227 (1981). The possibility of a conflict of interest was sufficiently apparent that a duty to inquire further was imposed on the trial court. *Id.* at 272, 101 S.Ct. at 1104, 67 L.Ed.2d at 230. The case was remanded for a new hearing to determine if an actual conflict existed. *Id.*

In *Wheat v. United States*, the Supreme Court held that the trial court properly denied defendant's request, made two days before trial, to be represented by a lawyer also representing a co-defendant. *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140, 151 (1988). The government objected to the defendant's request on the ground that the lawyer could not effectively cross-examine the other defendant on behalf of his new client. *Id.* at 155, 108 S.Ct. at 1695, 100 L.Ed.2d at 146. The court proceeded to find that the district court's refusal to substitute counsel was within its discretion. *Id.* at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 151.

In *Hamilton v. Ford*, 969 F.2d 1006 (11th Cir.1992), the Eleventh Circuit found the defendant was denied effective assistance of counsel and that an automatic reversal was required because the trial court failed to conduct an adequate inquiry:

> We now hold that when defendants make timely objections to joint representation, they need not show an actual conflict of interest when a trial court fails to inquire adequately into the basis of the objection. In such circumstances the trial court has failed to discharge its constitutional duty

under *Holloway* to determine whether the defendants are receiving adequate assistance of counsel, a duty separate from the *Cuyler* framework. Reversal, therefore is automatic.

*Hamilton,* 969 F.2d at 1011.

A conflict of interest also arose in *United States v. Cook,* where the defendant's Sixth Amendment rights were violated when the court ordered the defendant's attorney to advise a prosecution witness of the consequences of her failure to comply with her plea agreement to testify against the defendant. *United States v. Cook,* 45 F.3d 388, 392 (10th Cir.1995).

In *United States v. Levy,* the government alerted the trial court to several alleged conflicts in counsel's representation of two defendants, but the court conducted an initial inquiry, thus avoiding an automatic reversal. *United States v. Levy,* 25 F.3d 146, 154 (2d Cir.1994). However, this case was reversed and remanded for a new trial because actual conflicts were demonstrated by defendant that adversely affected his counsel's performance. *Id.* at 157–58.

An actual conflict was also found in *Smith v. Lockhart,* where the defendant asked for a new counsel twelve days before trial, citing conflicts in that attorney Marquette had poorly represented other defendants, served as a part-time municipal judge, represented defendant and another defendant on another charge, and defendant had sued Marquette and the judge in federal court. *Smith v. Lockhart,* 923 F.2d 1314, 1317–18 (8th Cir. 1991). The trial court told defendant he had to accept Marquette as his lawyer or proceed pro se. *Id.* at 1317. The court then appointed Marquette as "legal advisor," even though Marquette expressed misgivings about being appointed to that role. *Id.* at 1318. The circuit court reversed, ordering a new trial with new counsel before a new judge. *Id.* at 1322.

In *United States v. Ellison,* the Seventh Circuit reversed and remanded, finding that defendant's counsel testified against him and deprived him of meaningful cross-examination of witnesses. *United States v. Ellison,* 798 F.2d 1102, 1109 (7th Cir.1986). Counsel had allegedly advised defendant "that he, the attorney, would have to work with the 'federal people' in the future and that, therefore, it was 'best not to make waves when there is little if any chance of fighting Federal Prosecutors.' " *Id.* at 1104.

By contrast, a Sixth Amendment violation was not found in *Horton.* The conflict there alleged was that Horton's attorney, approximately a week after his appointment, was reported to be one of the finalists for the position of United States Attorney. *Horton,* 845 F.2d at 1415. The court analyzed the alleged conflict as follows:

> We note that [defense counsel] Callaway's candidacy was not a secret.... Even though it might have been advisable for Callaway to have informed the court and his client of his possible future employment, any failure to do so by no means gives rise to the presumption that, in total disregard of his professional responsibilities, his representation of Horton therefore was adversely affected. In those cases where courts have presumed that the adequacy of representation was adversely affected, a lawyer has been involved in a conflict of interest with the client "which is always real, not simply possible, and which, by its nature, is so threatening to justify a presumption that the adequacy of representation was affected." *United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984)....

By contrast, this case presents at most a remote possibility of a conflict of the type with which *Cuyler* was concerned. Though it is conceivable that an unprincipled defense attorney in line for a job as United States Attorney might encourage a defendant in some circumstances to plead guilty in order for counsel to curry favor with his or her future employer, that is too fanciful upon which to base a *per se* rule of conflict. Callaway was seeking the position of United States Attorney, a high position of great responsibility which involves appointment by the President of the United States and confirmation by the Senate. There was no one known in the local United States Attorney's office with whom Callaway could have "curried favor" and advanced his appointment. Nor was

this case a high-publicity criminal prosecution in which there was public interest, or anything else which would attract the attention of those involved in the selection and confirmation process. In any event, a candidate for a high federal position in his professional field would not advance his own interests by demonstrating that he is a weak or unskilled attorney on behalf of his client's interests. We do not believe that the fact of Callaway's unsuccessful candidacy for United States Attorney, in and of itself, gave rise to a conflict of interest as a matter of law. . . .

. . . .

Horton next argues however, that even if Callaway's vying for the position of United States Attorney did not create an actual conflict as a matter of law, his conduct during the course of his representation demonstrated that there was in fact a conflict that adversely affected Callaway's performance. Horton maintains that Callaway "pulled his punches" at every phase of the proceedings, that he filed no substantive motions, did no substantive research, performed no independent investigation or trial preparation and failed to submit a jury instruction regarding a theory of defense. Instead, Horton maintains, Callaway continuously pressed Horton to enter a guilty plea, but Callaway's lack of preparation and diligence in preparing the case precluded him from recommending a knowing and intelligent plea to Horton. . . .

The record in this case clearly establishes however, that even assuming a potential conflict presented itself, there clearly was no adverse effect on Callaway's performance. On the contrary, we are convinced that Callaway made the best of a bad situation. The record of the *ex parte* hearing reveals that Callaway was faced with a recalcitrant client who refused to cooperate with his counsel or the magistrate.

*Id.* at 1419–20 (citations omitted).

### 2. Counsel of Choice

In *State v. Vanover*, we outlined the considerations governing a defendant's choice of counsel. *See State v. Vanover*, 559 N.W.2d 618, 626–27 (Iowa 1997). Pertinent to the case at bar are the following principles stated therein:

The Sixth Amendment to the Federal Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Fourteenth Amendment to the Federal Constitution makes this provision binding on the states. *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562, 566 (1975).

The purpose of this Sixth Amendment provision is to ensure that criminal defendants receive a fair trial. *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1696–97, 100 L.Ed.2d at 148. In reviewing Sixth Amendment claims, the focus is therefore "on the adversarial process, not on the accused's relationship with his lawyer as such." *Id.*

The accused has a presumptive right to counsel of choice. That right, however, is not absolute. *Id.* at 159, 164, 108 S.Ct. at 1697, 1699–700, 100 L.Ed.2d at 148–49, 152 ("[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir.1993) ("accused . . . does not have the absolute right to counsel of her own choosing"); *In re Paradyne Corp.*, 803 F.2d 604, 611 n. 16 (11th Cir.1986) (same); *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir.1986) (same); *United States v. Rankin*, 779 F.2d 956, 958 (3d Cir.1986) (same); *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir.1985) (same).

There are times when an accused's right to counsel of choice must yield to a greater interest in maintaining high standards of professional responsibility in the courtroom. A trial court may therefore disqualify counsel if necessary to preserve the integrity, fairness, and professionalism of trial court proceedings. *Wheat*, 486 U.S. at 160, 108 S.Ct. at 1698, 100 L.Ed.2d at 149 ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of

the profession and that legal proceedings appear fair to all who observe them."); ... *In re Paradyne Corp.*, 803 F.2d at 611 n. 16 (right to counsel of choice does not override broader societal interests in effective administration of justice); *Washington*, 797 F.2d at 1465 (right to counsel of choice must give way where its vindication would create a serious risk of undermining public confidence in the integrity of our legal system); *Rankin*, 779 F.2d at 958 (right to counsel of choice must be balanced against requirements of fair and proper administration of justice); ....

In evaluating disqualification issues, trial courts

> must recognize a presumption in favor of [the accused's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court. *Wheat*, 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152.

*Id.*

### 3. Scope of Review

In *Vanover*, we then set forth the appropriate scope of review for this Sixth Amendment issue:

> Whether the facts show an actual conflict of interest or a serious potential for conflict of interest is a matter for the trial court's discretion. *Id.* Therefore our review of the district court's decision is for abuse of discretion. *See Locascio*, 6 F.3d at 931 (interpreting *Wheat* as providing for abuse of discretion scope of review on disqualification issues). We find an abuse of discretion only when the party claiming such shows that the discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *State v. Ruble*, 372 N.W.2d 216, 218 (Iowa 1985). ...

We review constitutional issues de novo. *State v. Spencer*, 519 N.W.2d 357, 359 (Iowa 1994). *Wheat* modifies somewhat this review. The legal standard is actual conflict of interest or serious potential for conflict of interest. *Wheat* requires that appellate courts give deference to a trial court's factual findings leading to the legal conclusion whether there is or is not an actual conflict of interest or a serious potential for conflict of interest. *See Wheat*, 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152 ("The evaluation of the facts and circumstances of each case under [the actual conflict or serious potential for conflict standard] must be left primarily to the informed judgment of the trial court."); *cf. State v. Rademacher*, 433 N.W.2d 754, 759 (Iowa 1988) (recognizing de novo review of constitutional claim, but giving deference to district court's factual determination on matter of prosecutorial intent to generate a mistrial).

*Id.* at 627.

### 4. Analysis

Atley claims that his Sixth Amendment rights have been violated and that a reversal and order for a new trial is mandated by the case law interpretations of this constitutional right. He asserts that when the trial judge was alerted of a potential conflict of interest by Weinberg, the court failed to conduct an inquiry, thus requiring an automatic reversal. *See Hamilton*, 969 F.2d at 1011. Atley further asserts that the court's consideration of the issue was merely a speech that did not amount to an inquiry and therefore requires reversal.

We apply the authorities cited herein that require an inquiry by the court, it being clear that the court was fully advised of the existence of this issue. *See Cuyler*, 446 U.S. at 349, 100 S.Ct. at 1719, 64 L.Ed.2d at 347. We consider the factual situation as presented to the court to see if an actual conflict of interest or a serious potential for conflict affected the case. *Wheat*, 486 U.S. at 165, 108 S.Ct. at 1700, 100 L.Ed.2d at 152.

■ There is no evidence in this record that Weinberg's future employment in the county attorney's office created an actual conflict of interest. Weinberg only learned on June 1, 1995 of this employment that would not begin until June 15, 1995. Weinberg had been appointed to represent Atley

since January 27, 1995 and had prepared the case for trial from then until June 1, 1995. Weinberg diligently prepared Atley's case, without any actual conflict, up to the day scheduled for trial. Moreover, Weinberg immediately informed Atley on June 1 of his future employment, so that Atley's reliance on counsel was never compromised.

The actual or serious potential for conflict that might occur during the trial necessitated an inquiry by the court to assess its gravity. Atley claims the trial court's inquiry was inadequate because it assumed the answers to questions it did not ask. Atley contends Weinberg should have been asked if he could put aside concerns over Atley's threat to file a grievance against him, put aside concern over his future job, and rigorously cross-examine people he would work with later. Atley says the court should have inquired of him and found that he was left with no confidence in his attorney.

The inquiry hearing held by the court, however, shows that it was well aware of the possible conflicts of interest. Weinberg, Atley, and the prosecutor all had presented the cards face up for the court to read. This situation was not like those cases in which an attorney seeks to represent two defendants which require an in-depth questioning by the court to determine how the lawyer's defense of one defendant will impact his proposed defense for the other defendant. *See Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.Ed.2d at 148; *Holloway*, 435 U.S. at 491, 98 S.Ct. at 1182, 55 L.Ed.2d at 438. It is unlike those cases where the lawyer is also a potential defendant and may therefore compromise the defense of his client. *See Levy*, 25 F.3d at 150–51; *Cancilla*, 725 F.2d at 870. Nor is it a case of questionable competency of the lawyer. *See Lockhart*, 923 F.2d at 1321.

The Sixth Amendment issue in the instant case is more like that addressed in *Horton*, where the court found no conflict from the fact that defense counsel was a finalist candidate for United States Attorney. *Horton*, 845 F.2d at 1419. The situation was deemed to show "at most a remote possibility of a conflict." *Id.* The Seventh Circuit said:

Though it is conceivable that an unprincipled defense attorney in line for a job as United States Attorney might encourage a defendant in some circumstances to plead guilty in order for counsel to curry favor with his or her future employer, that is too fanciful upon which to base a *per se* rule of conflict. . . . In any event, a candidate for a high federal position in his professional field would not advance his own interests by demonstrating that he is a weak or unskilled attorney on behalf of his client's interests.

*Id.* at 1419.

In the case at bar, the trial court was alerted to a potential conflict arising from Weinberg's future employment. The court was aware of Weinberg's discomfort in his role as defense counsel. Atley voiced his objections orally and by motion. The court knew that the MEG officers would testify about the seizure of drugs and that Weinberg would be cross-examining them. Given this background of facts established, it is unlikely that further questioning of any of these people would have shed more light on the matter from which the court could base its decision. The court already had sufficient facts in front of it that a further, in-depth inquiry, was not necessary.

The test for a Sixth Amendment violation is not whether the defendant is dissatisfied with his lawyer, or whether the lawyer's relationship with the defendant is strained or difficult. Rather, in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 n. 21 (1984).

At trial, Judge Alper's focus was on the adversarial process. This was not a theoretical exercise. Factored into the consideration of that process was the court's personal knowledge of Weinberg and what his capabilities were. This was not a situation where the judge has no acquaintance or knowledge of the defense attorney involved, as may often happen in metropolitan areas having a large roster of attorneys. Here, the court stressed that Weinberg was a competent and

skilled attorney known to the court, who was presently zealously representing the defendant, and who would do an excellent job representing Atley at trial. There was even less likelihood that the defense by Weinberg would be compromised than in *Horton* because Weinberg had already secured his future employment, rather than merely being a candidate for the job, thus dispelling any notion of a need to curry favor. Moreover, Atley himself was not an unskilled novice lost in the wilderness of the legal thicket. He wanted to act as his own co-counsel.

### 5. Disqualification

■ We have held that district court rulings regarding disqualification of attorneys are subject to appellate review for abuse of discretion. *Federal Land Bank v. Tiffany*, 529 N.W.2d 294, 296 (Iowa 1995). An abuse of discretion occurs only when the discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *Ruble*, 372 N.W.2d at 218. Trial court discretion is especially broad when a disqualification motion arises during trial, or when trial is imminent. *Killian v. Iowa Dist. Ct.*, 452 N.W.2d 426, 428 (Iowa 1990).

The decision by the trial court not to grant a continuance because there was not a serious potential for a conflict of interest was not an abuse of the trial court's discretion. Realizing that the defendant's Sixth Amendment rights must be protected, the court still found that the adversarial process would not be jeopardized. The trial court had also to consider that Weinberg was the third court-appointed attorney to represent Atley. The trial had been repeatedly continued at defendant's request or because he could not get along with his lawyer. In considering the background for this decision, we cannot say that the court abused its discretion. The denial of the motion for continuance was proper.

### C. Statutory Vagueness

Atley further claims a constitutional violation in that the charging statute for possession of psilocybin is unconstitutionally vague.

■ We review constitutional claims de novo. *State v. Hunter*, 550 N.W.2d 460, 462 (Iowa 1996); *State v. Huisman*, 544 N.W.2d 433, 436 (Iowa 1996).

Section 124.401(1) of the Iowa Code makes it unlawful "to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance...." Iowa Code § 124.401(1). As applied in this case, the relevant controlled substance is defined as:

4. Hallucinogenic substances. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, ...:

....

s. Psilocybin.

*Id.* § 124.204(4)(s).

Atley asserts that the statute is unconstitutionally vague because it does not specify any mushroom varieties that are illegal to possess, and as such there is a failure to notify the public of what conduct is specifically prohibited. He also argues there is a consequent failure to set forth explicit standards for the enforcement of the statute. Atley contends the statute is only constitutional as to possession or manufacture of psilocybin itself, but not psilocybe mushrooms, from which psilocybin may merely be extracted.[1] Atley argues that absent evidence that he actually chemically extracted the psilocybin from the mushrooms, he is not in violation of the statute. In support of this contention, he points to the legislature's decision to make possession of certain plants illegal, independent of the separate provision prohibiting possession of the illicit substance that can be extracted from them. *See, e.g.*, Iowa Code § 124.204(4)(m) (marijuana) and § 124.204(4)(u)(THC); § 124.204(4)(n) (peyote) and § 124.204(4)(p) (mescaline). We find these distinctions, however, to be non-dispositive of this case.

In considering whether a penal statute is void for vagueness, we are guided by our recent decision in *Hunter*. In *Hunter*, we

---

**1.** There is no dispute in this case that, from either a legal or scientific standpoint, psilocybe is a genus of mushroom that contains the hallucinogenic substance psilocybin.

adopted an analytical approach for examining the constitutionality of a statute that is challenged for vagueness by one who has been convicted under it. As an initial consideration, we noted,

> "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

*Hunter*, 550 N.W.2d at 463 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903, 909 (1983)).

### 1. Standing

Although neither party has raised the issue of standing in this case, it is nevertheless a central issue to this constitutional question and must be examined. *See Hunter*, 550 N.W.2d at 463; *State v. Price*, 237 N.W.2d 813, 816 (Iowa 1976). There is a distinction to be made between defendant Atley having standing to challenge the constitutionality of a statute for vagueness as it is applied to him, and to challenge the statute as applied to all possible defendants. In *Hunter*, we explained:

> A defendant charged with the violation of a statute has standing to claim the statute is unconstitutionally vague as applied to him or her. A defendant does not necessarily have standing to claim, in addition, that a statute is unconstitutional as applied to others.
>
> If a statute is constitutional as applied to the defendant, the defendant lacks standing to make a facial challenge unless a recognized exception applies.

*Hunter*, 550 N.W.2d at 463 (citations omitted).

### 2. Vague as Applied

We first determine whether the statute is vague as applied to Atley. In doing so, we examine the statute to determine whether his conduct "clearly falls 'within the proscription of the statute under any construction.'" *Id.* at 465 (quoting *Price*, 237 N.W.2d at 816). In doing so, statutes are given a strong presumption of constitutionality and will be given any reasonable construction necessary to uphold them. *Id.* at 462; *State v. Osmundson*, 546 N.W.2d 907, 909 (Iowa 1996). We also note "[t]he fact that a statute may be vague as applied to other factual scenarios is irrelevant to this analysis." *Hunter*, 550 N.W.2d at 465.

We do not find that section 124.401(1) is vague as applied to Atley. It appears clear that his mushroom farm falls within the scope of section 124.401(1). The legislature's use of the phrase "any material ... which contains ... psilocybin" in section 124.204(4)(s) leads us to the conclusion that psilocybe mushrooms fall within the proscribed category of hallucinogens, regardless of whether Atley was actually engaged in extracting the psilocybin from them. Certainly a psilocybe mushroom is a "material containing psilocybin," under the ordinary and reasonable use of these words. We are in accord with other jurisdictions which have interpreted similar statutes' terms as encompassing the psilocybe mushrooms themselves. *See People v. Dunlap*, 110 Ill.App.3d 738, 66 Ill.Dec. 466, 470, 442 N.E.2d 1379, 1383 (1982) ("Since the Controlled Substances Act is explicit in prohibiting 'any material' containing psilocybin, the failure to mention mushrooms in that Act cannot negate that provision."); *State v. Justice*, 10 Kan.App.2d 569, 704 P.2d 1012, 1018 (1985) ("We agree ... that the use of the phrase 'any material ... which contains' psilocybin, provides ample notice that *mushrooms* containing psilocybin are controlled.").

Regardless of whether ambiguity may exist in other factual contexts (such as when a person unknowingly gathers psilocybe mushrooms in the wild), Atley was fairly apprised of the illegality of his conduct. The record strongly supports a determination that Atley had the necessary criminal knowledge and intent to possess and manufacture mushrooms containing psilocybin. He maintained an enormous growing operation, constituting the majority of space in his residence. He told an MEG officer that he sold the mushrooms for $800 per pound, had numerous aliases, and used different post office boxes to facilitate his trade. He professed to be an expert on mushroom cultivation and the law

governing it. Atley had also been the subject of previous criminal proceedings for possession and manufacturing of psilocybe mushrooms in another jurisdiction. *See People v. Atley,* 727 P.2d 376 (Colo.1986).

Based on these facts, Atley can hardly claim that his conduct was innocent and that he ignorantly violated the statute. We do not believe that a person of ordinary intelligence would not be able to determine that knowingly cultivating and selling hallucinogenic mushrooms would fall within the purview of the statute. Furthermore, by requiring scienter as an element of the offense, law enforcement officials are sufficiently able to distinguish between those persons who innocently gather wild psilocybe mushrooms and those who specifically cultivate them to profit from their hallucinogenic qualities.

A defendant must have knowledge, be it constructive or actual, that he or she is in possession of a controlled substance. As we have stated,

> the State is required to prove both that the defendant knowingly or intentionally possessed a controlled substance, and that the defendant knew the substance he or she possessed was a controlled substance in the prosecution of charges under either subsection 204.401(1) or subsection 204.401(3).

*State v. Franzen,* 495 N.W.2d 714, 717 (Iowa 1993); *see also State v. Parrish,* 502 N.W.2d 1, 3 (Iowa 1993).[2] The requirement of scienter for prosecutions under section 124.401(1) ensures that a person who innocently possesses psilocybe mushrooms could not be successfully prosecuted under the statute because he or she would lack the necessary criminal knowledge and intent. As we recognized in *Hunter,* "[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hunter,* 550 N.W.2d at 466 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 372 (1982)).

This determination is also consistent with other jurisdictions that have considered this argument. *See Dunlap,* 66 Ill.Dec. at 472, 442 N.E.2d at 1385 ("An individual who cultivated or otherwise possessed *Psilocybe* mushrooms without knowing them to contain psilocybin would not be prosecuted successfully under the statute, because . . . the State must prove that a defendant had knowledge of the nature of the substance possessed or sold."); *Bemis v. State,* 652 N.E.2d 89, 92 (Ind.App.1995) ("Because the Indiana statute includes scienter as an element of the offense, there is no danger that a person would be convicted for innocently possessing the psilocybin mushrooms.").

Atley cites a decision of the Florida Supreme Court in support of his vagueness argument. In *Fiske v. State,* the defendant was arrested when he was found in the woods possessing a bag of what were later determined to be psilocybe mushrooms. *Fiske v. State,* 366 So.2d 423, 424 (Fla.1978). The Florida Supreme Court held that the Florida statutes making psilocybin possession illegal were unconstitutional as applied to the defendant because they did not specifically proscribe possession of psilocybe mushrooms. *Id.* Atley urges us to adopt this analysis in resolving the constitutional question in his favor.

We find that *Fiske,* however, has been aptly distinguished by another jurisdiction addressing this issue. In *State v. Justice,* the Kansas Court of Appeals considered a set of circumstances nearly identical to those in the case before us and found that a statute prohibiting possession of psilocybin, but not expressly psilocybe mushrooms, met constitutional muster. *Justice,* 704 P.2d at 1018. In regard to *Fiske,* the court stated:

> Of controlling importance in the Florida court's decision was the complete absence of any evidence that defendant knew that the mushrooms in his possession contained psilocybin. The court did not strike down the statute itself as unconstitutional but held that it could not be applied to a defendant who was not shown to have

**2.** Section 204.401 and section 204.403 were the statutory predecessors to the statutes in question here. *See* Iowa Code Ann. ch. 204 (West 1994).

criminal knowledge. In other words, the court held that as to people who possess mushrooms without knowing they contain psilocybin, the statute failed to provide a sufficient warning of the criminality of their conduct.

*Id.* at 1016.

Thus, we find that the analysis utilized in *Fiske* to be non-persuasive in the case before us where the defendant's knowledge is established. The better analysis is found in those cases decided subsequent to *Fiske*, where each court ultimately concluded that possession of psilocybe mushrooms is illegal under their respective codifications of the Uniform Controlled Substance Act. *See Dunlap*, 66 Ill.Dec. at 470, 442 N.E.2d at 1383; *Bemis*, 652 N.E.2d at 93; *Justice*, 704 P.2d at 1018; *State v. Boyer*, 91 Wash.2d 342, 588 P.2d 1151, 1152 n. 1 (1979); *State v. Patterson*, 37 Wash.App. 275, 679 P.2d 416, 421 (1984).

We are also mindful of the mandate that in construing chapter 124, our codification of the Uniform Controlled Substances Act, we are to "effectuate its general purpose to make uniform the law of those states which enact it." Iowa Code § 124.60. Our interpretation of the statute is consistent with those jurisdictions which have similar proscriptions and is consistent with this legislative charge.

### 3. Facial Vagueness

■ Having determined the statute is constitutional as applied to Atley, we now consider whether he has standing to make a facial vagueness challenge. *Hunter*, 550 N.W.2d at 466. In order for a defendant to have standing to mount a facial challenge, the statute in question must reach a "substantial amount of protected conduct." *Id.* at 464.

■ In the case at bar, we do not find that the statute making possession of psilocybe mushrooms illegal reaches a substantial amount of protected conduct. Atley asserts on appeal that the First Amendment guarantee of freedom of religion protects his use and possession of psilocybin, because he contends it is used as part of a religious ceremony. Although such an argument may implicate an exception to the general rule of

standing and serve as grounds to facially challenge a statute, we find his assertion to be meritless and without support in the record. *See id.* at 463; *Price*, 237 N.W.2d at 816. We cannot conceive how, in this case, his cultivation of hallucinogenic mushrooms rises to the level of protected conduct. Thus, the case before us is "inappropriate for the adjudication of the hypothetical claims of persons not before us." *Hunter*, 550 N.W.2d at 466.

### D. Ineffective Assistance of Counsel

Finally, defendant makes numerous claims of ineffective assistance of counsel. He claims he was denied effective representation because his attorney failed to object to the introduction of certain evidence, failed to object to the submission of a jury instruction, failed to object to allegedly improper and prejudicial use of the term "psilocybin," failed to convince the trial court to accept a plea agreement, and generally failed to zealously defend him and make appropriate strategic and tactical decisions.

■ But as the State correctly notes, claims of ineffective assistance of counsel raised on direct appeal are ordinarily reserved for postconviction proceedings to allow full development of the facts surrounding counsel's conduct. *See State v. Rawlings*, 402 N.W.2d 406, 408 (Iowa 1987); *State v. Mulder*, 313 N.W.2d 885, 890 (Iowa 1981). Only in rare cases will the trial record alone be sufficient to resolve the claim. *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978). In the case at bar, the record is insufficient to resolve these issues. With the exception of Atley's Sixth Amendment claim, his assertions of ineffective assistance of counsel are reserved for postconviction proceedings, if any are brought. Our review of the record convinces us that the errors alleged by Atley are without legal merit. His convictions are affirmed.

**AFFIRMED.**

All justices concur except LAVORATO, J., who dissents, and is joined by ANDREASEN and TERNUS, JJ.

LAVORATO, Justice (dissenting).

The attorney functions in an adversary system based upon the presupposition that the most effective means of determining truth is to present to a judge and jury a clash between proponents of conflicting views. It is essential to the effective functioning of this system that each adversary have, ... "entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability."

Monroe H. Freedman, *Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions*, 64 Mich. L.Rev. 1469, 1470 (1965–66) (citation omitted).

An accused dissatisfied with appointed counsel "must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir.1991). Once the accused makes that showing, the trial court must appoint new counsel. *Id.; see also Holloway v. Arkansas*, 435 U.S. 475, 488–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426, 436–38 (1978).

The Sixth Amendment right to counsel includes a correlative right to representation unimpaired by conflicts of interest or divided loyalties. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220, 230 (1981); *Lockhart*, 923 F.2d at 1320. "Counsel must be willing 'to advocate fearlessly and effectively' on behalf of the client." *Lockhart*, 923 F.2d at 1320 (quoting *United States v. Hurt*, 543 F.2d 162, 167–68 (D.C.Cir.1976)). In attorney-client relationships,

> [c]onflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties, and can include situations in which the caliber of an attorney's services "may be substantially diluted."

*Id.* (citations omitted); *accord Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir.1979); *see also United States v. Cook*, 45 F.3d 388, 393 (10th Cir.1995) (holding that conflicts of interest are not limited to cases involving joint representation of co-defendants "but extend[ ] to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person").

Once the accused raises a seemingly substantial complaint about counsel, the judge must inquire thoroughly into the factual basis of the accused's dissatisfaction. *Lockhart*, 923 F.2d at 1320; William W. Schwarzer, *Dealing With Incompetent Counsel—The Trial Judge's Role*, 93 Harv. L.Rev. 633, 652 (1980). "The court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir.1994). The inquiry must be more than perfunctory; it must be "the kind of inquiry that might ease the defendant's dissatisfaction, distrust, or concern." *Lockhart*, 923 F.2d at 1320. And the inquiry should be on the record. *Id.* These obligations exist because trial courts have an independent duty to ensure that criminal defendants receive a trial that is fair and that does not contravene the Sixth Amendment. *Levy*, 25 F.3d at 153.

Once the accused shows sufficient cause for substitution of counsel but is nevertheless forced to trial with the same counsel, prejudice is presumed regardless of whether it was independently shown. *Holloway*, 435 U.S. at 489, 98 S.Ct. at 1181, 55 L.Ed.2d at 437–38; *accord Cook*, 45 F.3d at 393; *Lockhart*, 923 F.2d at 1321, *Zuck*, 588 F.2d at 439. Reversal is automatic. *Id.* The presumed prejudice and automatic reversal rules also apply where the accused objects and the trial judge fails to inquire adequately into the *possibility* of a conflict of interest. *Cook*, 45 F.3d at 393; *Hamilton v. Ford*, 969 F.2d 1006, 1012 (11th Cir.1992); *United States v. Sutton*, 794 F.2d 1415, 1419 (9th Cir.1986) (finding Sixth Amendment violations require automatic reversal if "trial judge fails either to appoint separate counsel or to take adequate steps to ascertain whether the risk is too remote to warrant individual representa-

tion"). There is good reason for assumed prejudice and automatic reversal:

> When there is a conflict of interest ... the prejudice may be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real ... a denial of the right to effective representation exists, without a showing of specific prejudice.

*Zuck*, 588 F.2d at 439 (quoting *Castillo v. Estelle*, 504 F.2d 1243, 1245 (5th Cir.1974)).

Contrary to the majority, I conclude from this record that Atley established good cause to require substitution of counsel. I also conclude the trial court failed to inquire adequately into the possibility of a conflict of interest. Under either conclusion, I think this record demands an automatic reversal without a showing of prejudice.

## I. *A Showing of Good Cause to Warrant Substitution of Counsel.*

A. *The employment issue.* From the record I think it is abundantly clear that Atley showed an actual conflict of interest and an irreconcilable conflict between his counsel and himself. Procedurally, Atley objected in sufficient time to apprise the district court of his objection to his counsel. Before trial, Atley filed a motion to remove counsel and for appointment of new counsel premised on two grounds:

> On June 1, 1995, defendant's attorney Robert Weinberg informed defendant he had accepted a job with the Scott County Attorney's Office, William Davis Chief Prosecutor, and informed defendant of ethical problems with his continued representation.

The other ground dealt with Atley's claim that his lawyer did not handle plea discussions and motions to his satisfaction.

On the same day, Weinberg, Atley's counsel, filed his motion to withdraw consistent with what Atley had said as to the employment issue:

> That the undersigned attorney was confirmed for an appointment in the office of the Scott County Attorney on June 1, 1995, said employment to begin on or about June 15, 1995.
>
> That said appointment raised an issue of potential conflict with defendant's interests which were promptly disclosed to defendant pursuant to Canon 5 of the Code of Professional Responsibility.
>
> That the defendant filed a motion for removal of counsel on June 2, 1995, based on the disclosure of potential conflict.

To his credit, Weinberg goes on with the following additional cogent reasons for his withdrawal as counsel:

> That Local Rule 3.4 requires counsel's termination of employment with permission of the court when the client consents to said termination and compliance with DR 2–110, Code of Professional Responsibility, on withdrawal of counsel.
>
> That DR 2–110(B) requires mandatory withdrawal from employment when (2) counsel knows continued employment would violate an ethical rule or (4) counsel is discharged by his client.
>
> That Canon 5 requires counsel to avoid the appearance of conflict with the interest of a client.
>
> That Canon 5 requires counsel to withdraw from representation if the effectiveness of his representation is impaired by the desires of third persons.
>
> That the undersigned attorney believes that the effectiveness of his representation has been irreparably harmed due to the expressed desire of the defendant to remove counsel from the case based on defendant's concern with a potential conflict of interest.
>
> That the undersigned attorney cannot represent the defendant effectively at trial.
>
> That the defendant has filed a motion for continuance, has waived speedy trial and is entitled to a reasonable time to prepare for trial with new counsel.

Three days later, just before the commencement of the trial, the trial judge held a hearing on these motions. As the majority notes, Weinberg stated additional reasons for

his motion to withdraw. At this point Weinberg revealed to the court that he had just learned that Atley had filed a complaint with our court. In Weinberg's mind, the complaint caused such a breach in his relationship with Atley that Weinberg believed he could not be effective and his ineffectiveness would be an impediment to upholding any subsequent conviction.

As the majority further notes, Weinberg was hired to replace Hugh Pries of the Scott County Attorney's Office. Pries handled a number of the drug cases for the county attorney's office and had close relationships with the MEG officers, who were to be the main witnesses against Atley. Weinberg revealed all of these facts to Atley.

To the prosecutor's credit, he concurred in Weinberg's assessment. Additionally, he advised the court that

> [m]ost of the cases and opinions that have dealt with changes of employment by lawyers have opted in favor of the client being given the rights, and not deprived of them, and I think that clearly, in this case, forcing this matter to trial today would be going against the general grain of those opinions.

I am amazed that the majority has closed its eyes to this obvious demonstration of actual conflict. As *Holloway* pointedly observed:

> Additionally, since the decision in *Glasser* [*v. U.S.*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)], most courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be granted. In so holding, the courts have acknowledged and given effect to several interrelated considerations. An "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." Second, defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem. Finally, attorneys are officers of the court, and "when they address the judge solemnly upon a matter

before the court, their declarations are virtually made under oath." We find these considerations persuasive.

*Holloway*, 435 U.S. at 485, 98 S.Ct. at 1179, 55 L.Ed.2d at 435 (citations omitted). I too find these considerations persuasive here on the question of an actual conflict of interest. Granted, this is not a dual representation case but these considerations, considered persuasive by the Supreme Court, I think apply with equal force to any conflict of interest situation, and particularly here. Who better than the lawyer who has to do battle in court, knows whether, faced with similar glaring conflicts, he or she can be effective? Should a trial judge simply ignore the solemn admissions given in professional statements and believe it knows better than the lawyer? I think not. By allowing the trial court to ignore such admissions, the majority is creating dangerous precedent. The majority should heed *Holloway's* advice:

> When a considered representation regarding a conflict in clients' interests comes from an officer of the court, it should be given the weight commensurate with the grave penalties risked for misrepresentation.

*Holloway*, 435 U.S. at 486 n. 9, 98 S.Ct. at 1179 n. 9, 55 L.Ed.2d at 435 n. 9.

As *Zuck* makes clear, the employment issue here falls within the parameters of actual conflict. In *Zuck*, the law firm that served as counsel in the accused's first-degree murder trial also represented, in an unrelated civil matter, the state prosecutor who tried the accused. The State asserted that no conflict of interest existed because the real party in interest in the accused's case was the State of Alabama and the prosecutor's only interest was in achieving justice, not in convicting the accused. Thus, the State argued, the defense attorneys' representation of the prosecutor presented no conflict with their commitment to defend the accused.

Rejecting this argument, the court said:

> The dual representation here created an actual conflict of interest. The prosecutor and defense attorneys here were adversaries for the purpose of this trial. It is sufficient to establish a constitutional viola-

tion that the defense attorneys owed a duty to Zuck to endeavor to refute the prosecutor's arguments and to impeach his witnesses ... [T]he defense attorneys were subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense of Zuck and dispense with the services of their firm.... Our analysis in conflict of interest cases does not focus on the actual effect of the conflict on a particular defendant's case. Rather, the basis of these decisions is our belief that the sixth amendment requires that a defendant may not be represented by counsel who might be tempted to dampen the ardor of his defense in order to placate his other client. The fact that a particular lawyer may actually resist that temptation is of no moment. The right to effective assistance of counsel is so vital to a fair trial that courts are compelled to examine every potential infringement of that right with the most exacting scrutiny. Determining whether a particular attorney has yielded to the temptation a conflict presents requires a searching analysis of his performance at trial. A cold, dispassionate appellate transcript simply cannot provide an adequate basis for assessing such a performance, for subtle variations in demeanor and depth of cross-examination cannot be reflected in the pages of a transcript. For this reason, the mere existence of a temptation in the abstract is sufficient to preclude duality of representation. A defense attorney must be free to use all his skills to provide the best possible defense for his client. Despite the noblest of intentions, the defense attorneys here may have been tempted to be less zealous than they should have been in the presentation of Zuck's case. This possibility is sufficient to constitute an actual conflict of interest as a matter of law. *Zuck,* 588 F.2d at 439–40; *cf. Cook,* 45 F.3d at 393 (holding that accused was denied effective assistance of counsel when trial court ordered defense counsel to advise a prosecution witness of the consequences of failing to testify in accordance with her plea agreement).

The conflict here is more egregious than the conflict in *Zuck.* Here, as the trial began, defense counsel was actually in the employ of the county attorney's office, having been hired to begin work shortly after the end of Atley's trial. In essence, defense counsel was an employee of the very law firm—the county attorney—representing the very party—the State of Iowa—that was opposing Atley in these proceedings. In his own mind, Weinberg was already in a position of divided loyalties. He had a future, perhaps with long-term job security, with the county attorney's office. Weinberg would be cross-examining the very people—MEG officers—with whom he would be working closely in his own employment. Weinberg was concerned about being able to give his undivided loyalty to Atley, especially if doing so conflicted with his upcoming employment. What greater temptation could force a defense attorney to "dampen the ardor of his defense in order to placate his other client?" The existence of this temptation was enough to preclude Weinberg's continued representation regardless of the trial judge's personal opinion. Weinberg knew this. The prosecutor knew this. Only the trial judge was blind to this fact.

In a weak attempt to justify the trial court's actions, the majority relies heavily on *United States v. Horton,* 845 F.2d 1414 (7th Cir.1988). This case is easily distinguishable. In *Horton,* defense counsel was only a finalist, together with three others, under consideration for a United States Attorney position. He was not actually appointed. In addition, Horton pleaded guilty; Atley did not. Horton agreed at the plea that he was satisfied with the representation and advice he received from his counsel and he was not pressured into pleading guilty. The plea agreement was most favorable to Horton. His plea was voluntary and there was a factual basis for it. Horton did not raise the employment issue at the trial court level when he was given a chance to explain the reason for his request for new counsel. When asked why he wanted new counsel, Horton simply offered a "vaguely-voiced" distrust of counsel and was for the most part uncooperative and uncommunicative with the trial court. Nor did Horton raise the employment issue on either a motion for withdrawal of his guilty plea or for collateral relief under 28 U.S.C.

§ 2255. He did so for the first time on appeal. But, most important, unlike the facts here, defense counsel and the prosecutor in *Horton* did not agree there was a conflict.

B. *The complaint issue.* Weinberg also brought to the trial court's attention that Atley had filed in our court a complaint against him. Weinberg was candid with the trial court that the complaint caused such a breach in the attorney-client relationship that he could not be effective. I think the complaint filed by Atley also created an actual conflict of interest.

Once defense counsel learns the client has filed a complaint about the manner of counsel's representation, counsel acquires a personal interest in the way counsel conducts the defense. *Douglas v. United States,* 488 A.2d 121, 136 (D.C.App.1985). As *Douglas* points out, such a personal interest

is independent of, and in some respects in conflict with, [the accused's] interest in obtaining a judgment of acquittal. For instance, fearing that [the accused's complaint] might later be expanded to include claims of ineffective assistance at trial, [defense counsel] would have an inordinate interest in conducting the defense in a manner calculated to minimize any opportunity for *post hoc* criticisms of [counsel's] efforts. This could compromise [counsel's] professional judgment about the best means of defending this particular case; it could encourage the most standard or conservative trial strategy, as well as overcautious tactical decisions and courtroom demeanor. Furthermore, concerns about the impending investigation might impede communications between [the accused and counsel]. [Counsel] might be apprehensive about sharing with [the accused] the reasons behind tactical defense decisions and refrain from disclosing to [the accused] any unexpected problem that arose during the course of trial. [The accused], in turn, might be reluctant to question [counsel's] trial decisions for fear of further alienating counsel in the midst of trial.

*Id.* at 136–37; *accord Lockhart,* 923 F.2d at 1321 (holding that accused's class action lawsuit that included his defense counsel created

actual conflict of interest); *Hurt,* 543 F.2d at 164–66 (holding that defamation suit against appellate counsel by trial counsel for the accused was a conflict of interest for appellate counsel on remand for evidentiary hearing on ineffectiveness claim).

II. *Failure to Inquire.*

That brings me to the second reason why there should be an automatic reversal. Once there is a timely objection and the trial court fails to inquire adequately into the *possibility* of a conflict of interest, reversal is automatic. *Hamilton,* 969 F.2d at 1012; *Sutton,* 794 F.2d at 1419; *cf. Wood,* 450 U.S. at 272, 101 S.Ct. at 1104, 67 L.Ed.2d at 230–31 (holding that mere possibility of a conflict of interest triggers duty to inquire). "The trial court must make the kind of inquiry that might ease the defendant's dissatisfaction, distrust, or concern." *Lockhart,* 923 F.2d at 1320.

Here Atley voiced his objection to Weinberg in his pretrial motion and at the hearing on the motion. As mentioned, Weinberg and the prosecutor agreed there was a conflict. The trial court never asked Atley one question. Rather, the court launched into a lengthy monologue in which the court assumed and expressly stated that Weinberg would do his job professionally and zealously and that the prosecutor and the state's witnesses would properly do their jobs. As for Atley's concerns, the court acknowledged it did not give his concerns a "huge amount of weight" because he was on "his third attorney" and the case had been pending for some months. Finally, the court viewed Atley's concerns as "part of a way to delay the proceedings."

As Atley points out, the "court's 'inquiry' was a monologue that assumes answers to questions never asked." Weinberg was not asked if he could put aside his concerns over Atley's complaint to our court. Considering Weinberg's pretrial motion and professional statements to the court, I think Weinberg's answer would have been an unequivocal "no."

Nor did the court delve into how serious the conflict of the new job might be and how that too might affect Weinberg's representation of Atley. Weinberg was not asked whether he would cross-examine vigorously

the very people with whom he would be working closely. Rather, the court simply refused to believe Weinberg's professional statement that he could not effectively represent Atley because of the several conflicts.

This record is totally devoid of any showing that Atley's dissatisfaction, distrust, and concern with Weinberg was put at ease.

What the trial court personally perceived about Weinberg was simply not relevant. On this point, one court aptly observed:

Whether or not the court is personally acquainted with the attorney to be associated, or whether or not the attorney enjoys the confidence of the court, are considerations wholly irrelevant to the constitutional issues confronting the trial court. It is the *defendant's* confidence which is at stake, not that of the court.

*Magee v. Superior Court of San Francisco,* 8 Cal.3d 949, 106 Cal.Rptr. 647, 649, 506 P.2d 1023, 1025 (1973).

To be sure, trial judges must be wary of defendants who employ complaints about counsel as dilatory tactics or for some other invidious motive. *United States v. Welty,* 674 F.2d 185, 193–94 (3rd Cir.1982). But here, Atley raised his concerns before trial and as soon as Weinberg told him of Weinberg's new job. Additionally, Atley never wavered in his objections, which were substantive and concurred in not only by his trial counsel but the prosecutor as well. To ascribe to Atley a motive to delay would necessarily mean the trial court was ascribing such a motive to Weinberg and the prosecutor as well. This record falls woefully short of showing that Atley's objections were merely to delay trial.

There is an old saying among lawyers that "bad facts make bad law." In its zeal to uphold a conviction based on what it views as overwhelming evidence of guilt, the majority has succeeded in turning on its head an accused's Sixth Amendment right to effective representation.

In sum, I would reverse and remand for a new trial on two grounds. First, the record is clear that Weinberg had an actual conflict of interest. Such a showing required the trial judge to appoint Atley new counsel. The court's failure to do so violated Atley's Sixth Amendment right to counsel. The violation mandates a reversal without a showing of prejudice.

Second, the record is also clear that Atley's objections to Weinberg should have—at the very least—triggered a possibility of a conflict of interest in the mind of the trial court. The court failed to inquire as to the conflict. Instead it required Weinberg to represent Atley notwithstanding Weinberg's repeatedly voiced concerns about conflicts of interests and possible ethical violations and his reliance on a local rule for withdrawal of counsel. This failure too violated Atley's Sixth Amendment right to counsel and mandates reversal without a showing of prejudice.

I would reverse and remand for a new trial.