# IN THE COURT OF APPEALS OF IOWA

No. 22-1958
Filed May 8, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DOUGLAS ARTHUR HAGENOW,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Cerro Gordo County, DeDra Schroeder, Judge.

A defendant appeals his convictions for sexual abuse. **AFFIRMED.**

Alexander Smith of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer, L.L.P., Des Moines, for appellant.

Brenna Bird, Attorney General, and Aaron Rogers, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Douglas Arthur Hagenow appeals his convictions for sexual abuse, contending that insufficient evidence supports his convictions because the witnesses are not credible and challenging the district court's ruling on his pretrial motions. Upon our review, we affirm Hagenow's convictions.

## I.    Background Facts and Proceedings.

In 2009, the Hagenow family moved from New Zealand back to the United States and settled in Mason City, Iowa. Hagenow opened a children's gymnastics gymnasium. His wife, a homemaker, sometimes helped around the family business. Together, they had five children: two sons, Michael and Christopher; a set of twin daughters, R.H. and A.H.; and their youngest daughter, K.H. During this time, the family lived and worked at the gymnasium.

At night, while the rest of the family slept, ten-year-old A.H. went into her parents' bedroom and lay next to Hagenow. Hagenow massaged A.H.'s body, starting with her shoulders to her ribs, then thighs, before moving to her inner thighs. He then digitally penetrated her. A.H. testified that "his penis would get hard." Sometimes he would have her touch him, too. Other nights, "he would rub his penis against [her] vagina." This occurred multiple times, "and it was the same process every time, same steps, same order." A.H. testified she knew when her father expected her that night because "[Hagenow] would be more touchy during the day/evening, and that's how I kind of had more of a signal."

In 2011, the family leased a new space and moved the gymnastics business. While it was being renovated, they resided in two different rental houses. Their first home was temporary because of its small size and, after less

than one year, they had moved again to the second rental home, which the family called "the Newman house." Because this house was larger, A.H. and R.H. had their own bedrooms, Christopher and Michael slept in the living room, and K.H. slept in the parents' room. The mother slept on an air mattress, and Hagenow slept on a standard twin mattress, with K.H. between them. It was in this room that A.H.'s abuse continued each week in the same routine as the old gymnasium. The mother never awoke during these occasions. A.H. recalled that the last time Hagenow abused her and asked her to reciprocate, she was fourteen years old and "pushed [her] hand away from him."

R.H., then age twelve, also testified she was abused at the Newman house in a manner called "morning cuddles." At least once per week, Hagenow would ask R.H. to come to the bed with him and "reach under [her] pants and underwear to touch [her] vagina." He would also put her hand on his penis and have her move her hand on it. R.H. said she "would try to push him away" but that Hagenow "would not listen, and he would just continue." There were other times where their interactions became violent. One time, Hagenow pinned her down on the bed with his body. Another time, Hagenow held R.H. against the wall and "was trying to make out with [her]" on her face, mouth, and neck while she tried to escape. The mother witnessed the struggle and repeated, "That's enough, Doug" several times before he released R.H. Of the incident, R.H. described being "terrified" and "trying to get away."

Seven-year-old K.H. was first abused by Hagenow while living at the Newman house. She testified that while "halfway asleep," Hagenow told her that "what he was going to do was going to feel good. And then he went under the

sheets, he pulled [her] underwear down, and he started to touch [her], touch [her] genitals with his mouth." K.H. described "his genitals [as] erect." This happened twice. Afterward, he asked K.H. "to go over to him and touch his genitals." When K.H. did not do as he wanted, he "turned around, gave [K.H.] the cold shoulder for the rest of the night." K.H. testified that her mother never noticed anything because Hagenow "was very careful enough to make it quiet." But the mother testified that she awoke on several occasions after hearing Hagenow "masturbating" while K.H. was in the bed.

The girls were rewarded when they complied with what Hagenow wanted them to do. A.H. testified that after incidents of abuse, Hagenow would make them "feel, like, special, like [they] meant something." Similarly, K.H. stated she "trusted him; and all I want[ed] was his love, for him to accept me." She recalled getting "a lot of positive feedback during the time of the abuse." But much like when Hagenow ignored K.H. after she did not do what he wanted, there were consequences for not complying, like Hagenow withholding attention and affection from the girls.

In May 2014, R.H. attended a youth ministry program. During one session about forgiveness, youth pastor Katie Zickefoose shared her childhood sex-abuse experience. Touched by her story and her willingness to forgive her abuser, R.H. wrote Zickefoose a letter where she vaguely disclosed her own abuse. After receiving the letter, Zickefoose met with R.H. in person, and R.H. identified her abuser as her father, Hagenow. Because Zickefoose was a mandatory reporter, she discussed with R.H. that she had to report the abuse, and R.H. wanted to be present. R.H., Christopher acting as her support person, and Zickefoose called

the Iowa Department of Human Services (DHS)[1] and reported the abuse. Zickefoose also notified the mother once the report had been made. The mother testified, "You know, I believed it from the get-go," explaining that "there was not a moment in my head that I didn't believe her." When the DHS contacted the mother about the allegations, they jointly completed a safety plan wherein the mother agreed to prevent contact between Hagenow and the girls, to cooperate with the investigation, and start R.H. in therapy.

Because Hagenow resided in the home with R.H. and other minors, the youth ministry paid for the mother and children to stay in a hotel room for the night. While at the hotel, the mother asked A.H. whether she had also been sexually abused, and A.H. said, "Yes."

As part of its investigation, the DHS scheduled forensic interviews for R.H., A.H., and K.H. at the Child Protection Center. Hagenow "told [the mother] that under no circumstances could [she] go to this meeting" or tell them K.H. co-slept with them because the DHS would remove the girls from the home. The mother "panicked." Despite the DHS's instructions to prevent contact, the parents called a "family meeting." R.H. protested at having to see her abuser, stating, "No, I don't want to. I don't want to see him at all." But the family meeting took place with Hagenow in the same room as the girls. At the meeting, the parents decided the best solution was to flee the country. They planned for the mother and children to hide in Minnesota, apply for New Zealand passports, and then cross into Canada

---

[1] In 2022, the legislature merged the Iowa Department of Human Services and the Iowa Department of Public Health to create the Iowa Department of Health and Human Services. But at the time of the report, it was still the Iowa Department of Human Services.

illegally to avoid border patrol. Once in Canada, they would fly to New Zealand because "[t]hey'll be watching the planes" in the United States and "come and take the girls" for trying to escape. A.H. was "relieved" to move back to New Zealand because she "had distance away from [her] abuser, that it wouldn't happen again."

The mother, the girls, and Michael packed up and traveled to the Red Roof Inn in Minnesota. Hagenow and Christopher, who lived outside the home with his then-girlfriend, stayed behind. In Minnesota, Michael was tasked with "taking the photos, editing the photos, doing the research to make sure that everything gets accepted the first time," and applying for their passport renewals. The parents confiscated everyone's cellphones, and the mother had only a prepaid "burner" phone to contact Hagenow "because he was so afraid that DHS would be listening in to [the] calls."

During the nearly three weeks they stayed in Minnesota, authorities struggled to locate the family after realizing the girls did not show up to school or the forensic interviews. The Mason City Police Department contacted Hagenow for a welfare check, and Hagenow told officers that he did not know where the mother and children were. Zickefoose also became concerned when R.H. did not come back to the youth group after the DHS report, so she texted her, "Hey, how you doing? Everything okay?" but did not receive an immediate response. Despite everyone's concerns for the children, the authorities did not take any court action at that time to force cooperation with the investigation.

Meanwhile, in Minnesota, two issues arose. First, the renewed passports could not be mailed to a hotel address, which prevented their escape. Second, the mother, Michael, and A.H. received a disturbing phone call from Hagenow.

Michael testified that during the conversation, emotions ran high because "[t]here was, you know, talk of [Hagenow] committing suicide." The mother described Hagenow as "distraught," stating his "life is over." She was worried he would step in front of a train. A.H. testified that her mother said, "If we come back, would you not do anything, not kill yourself?" and Hagenow replied, "Yeah."

Michael recalled that he and the mother later had a second phone conversation with Hagenow. In it, they determined that

> in order for us to come back down to Mason City, that [R.H.] would have to say that she made up the allegations. . . . Otherwise, as soon as we came back, if that wasn't made apparent during the phone call, DHS would have been involved and would have acted more assertively this time and try and keep the kids away from the parents.

After the conversation, the mother shared the plan with R.H. R.H. drafted a script to follow, stating that "it would help my mind that I could reference it and make sure that I'm lying the right way." She testified she "had no choice" in the plan and submitted because she "had nowhere to go." By phone, R.H., the mother, and Hagenow's attorney participated in her forced recantation, wherein R.H. said the abuse did not occur. Michael described R.H. as "sacrificing herself to keep us together, to kind of give in in such a way where she just had to give up." Despite being unable to contact the mother or R.H., the DHS closed their investigation after Hagenow's attorney sent them R.H.'s recantation.

The family returned to Iowa and reunited with Hagenow. R.H., A.H., and K.H. all testified they were never sexually abused again by Hagenow after R.H.'s disclosure, and K.H. "was not allowed to sleep in [her] parents' bed anymore." K.H. also testified that she felt her father's love was "conditional" on the abuse

occurring, and once it stopped, "he stopped caring about [her]." A.H. noticed a similar shift, with Hagenow not showing her love or affection once the abuse stopped.

Other changes were made. To prevent R.H. from contacting Zickefoose, Michael helped Hagenow install tracking software on her cellphone. The software "could capture audio, forward text messages," location, and other data to Hagenow. They also set up a "geo fence location" around both the youth ministry center and the Crisis Intervention Services, which would notify Hagenow if R.H.'s cellphone entered that area. R.H. was unaware of the software on her cellphone.

According to A.H., her twin came back to Iowa "a totally different person." Formerly a straight-A student in advanced classes who loved music and singing, R.H. started skipping school and eventually dropped out. She "wasn't sleeping" and was "having nightmares of [Hagenow] and blood." Michael testified that R.H. "slowly started to go more down into the road of depression." Hagenow was still not living in the home, staying at the new gymnasium during the renovations, and agreed to give R.H. space. But the mother recalled one incident where he banged on the bathroom door while R.H. was showering and demanded she open the door so he could use the restroom. After a brief verbal altercation between him and the mother, Hagenow stated, "No. This is my house, this is my rules" and stormed in to use the restroom. After, the mother went into the bathroom to check on R.H., she found her huddled in the corner of the shower, "just wrapped up like she was scared shitless." At this point, the mother decided, "I need to do something, because it wasn't going well." R.H. expressed wanting to go into foster care "because [she] just could not be around [Hagenow] anymore." But R.H.'s maternal

grandmother in New Zealand agreed to take R.H. in, and R.H. moved there at the age of sixteen. R.H. was excited to go because "being an ocean away from [Hagenow]" made her feel safe.

Around this same time, the renovations on the business were completed enough that the family moved from the Newman house to what they called the "new gym." Hagenow continued to distance himself from A.H. and K.H., and the family lived at the new gym for several years.

In 2019, R.H. redisclosed her sexual abuse to New Zealand law enforcement. While an investigation occurred, no formal charges were filed.

Still at the new gym, in 2020, K.H. disclosed to the mother that she had been sexually abused by Hagenow. The mother did nothing about K.H.'s disclosure because her immigration status prevented her from financially taking care of the children without Hagenow. After K.H.'s disclosure, the three sisters communicated over messaging that they had all been sexually abused by Hagenow, although they never shared any details with one another.

In 2021, R.H. redisclosed her abuse a third time and included what happened to her sisters in the report. When A.H. heard this, she was angry with R.H. and "kept telling her, 'It's my story. I should have the choice on when I'm ready to tell it.' But [R.H.] said, 'Your story is—is interwoven with mine. Therefore, I couldn't not tell your story with my story.'" Based on R.H.'s allegations, the Mason City Police Department investigated, working with New Zealand law enforcement as part of its inquiry. This time, the mother allowed K.H. to be interviewed at the

Child Protection Center,[2] and all three girls participated, with R.H. appearing virtually because she was still in New Zealand. Each of the girls disclosed that Hagenow sexually abused them as minors in their separate interviews.

Hagenow was charged with: Count I, second-degree sexual abuse; and Counts II and III, third-degree sexual abuse. While being held in jail pretrial, he communicated with the outside world through jail-monitored text messages. He directed his brother to liquidate the gymnastics business and use the funds to "negotiate with girls [to get] all charges dropped." He told the mother "to sell everything. Like, he was saying, 'Don't be stupid. Sell, sell, sell. Take cash only. No checks.'" Initially hesitant, the mother was eventually persuaded to liquidate the gymnasium and move in with her son. The mother testified that the majority of the funds went to the lease buyout on the new gym, but each of her children received $4100 and she received $3800. Any other proceeds and funds went to the mother's living expenses because she was still unable to work due to her immigration status.

When the State attempted to amend the trial information to add charges, Hagenow moved to sever the counts into three trials. Neither party's motion was successful. In the order denying Hagenow's motion, the court concluded that each count was part of a "common scheme or plan" and there was no unfair prejudice to the defendant by not separating them.

Two weeks pretrial, Hagenow's counsel withdrew based on an ethical conflict. The State resisted the withdrawal because R.H. had already been flown

---

[2] By this time, R.H. and A.H. were no longer minors and could consent to their own interviews. Only K.H. required parental permission to attend the interview.

in at State expense for her deposition and the trial. Because the conflict was unresolvable, the court granted the withdrawal and continued the trial for a later date.

Three weeks before the continued trial, Hagenow moved for substitute counsel. At a hearing on the motion, Hagenow made several requests for court-expensed transcription of evidence already available in another format, for court-expensed expert testimony on witness credibility, for evidence that did not exist, and for court-expensed software to view seized data. Most of these requests were denied. Instead, the court allowed Hagenow access to a blank laptop computer while in jail to view the seized evidence. Hagenow also alleged his trial counsel was neglectful and "simply ignores his client" because he was not answering his numerous voicemail messages.

Hagenow further claimed that he and his counsel had a "fundamental difference" regarding trial strategy. Hagenow wanted to assert that the mother and children were alleging sexual abuse purely to liquidate the business and share the proceeds of the sale. Hagenow's counsel opined that it was a "losing defense" but agreed to ask questions regarding the economic-advantage defense to appease his client.

The court ultimately denied Hagenow's motion for substitute counsel. It determined Hagenow had alternative ways to contact his attorney, his trial counsel had hired additional staff since the complaints, and the parties seemed agreeable to the compromises proposed by the court. Hagenow and his counsel "both indicated that they [were] ready to proceed with trial as scheduled" at the end of the hearing.

After a four-day trial, the jury found Hagenow guilty of the crimes as charged. He appeals, arguing insufficient evidence supports the convictions and that the court abused its discretion when denying his pretrial motions.

## II.    Sufficiency of the Evidence.

Hagenow first contends that insufficient evidence supports his convictions because the witnesses are not credible. We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). Viewing the evidence in the light most favorable to the State, a verdict is binding on our court if "supported by substantial evidence." *Id.*

While we reserve credibility determinations for the factfinder, *see id.*, Hagenow relies on *State v. Smith* to argue we have previously placed restraints on our deference to the jury's findings. 508 N.W.2d 101, 103 (Iowa Ct. App. 1993). The limitation *Smith* relied on derived from the "*Graham* rule," in which a witness gave blatantly contradictory testimonies at two separate trials. *Id.*; *accord Graham v. Chi. & N.W. Ry. Co.*, 119 N.W. 708, 711 (Iowa 1909). Hagenow is correct that we have previously placed limits on the jury's credibility determinations when "the testimony of a witness may be so impossible, absurd, and self-contradictory that the court should deem it a nullity." *State v. Mitchell*, 568 N.W.2d 493, 503 (Iowa 1997) (internal citations omitted). Part of the reason the *Graham* rule was applied was because there was no other corroborating evidence available; the witness's testimony was the only evidence. *Fazio v. Brotman*, 371 N.W.2d 842, 844 (Iowa Ct. App. 1985). But we also note that "*Smith* is an outlier," *State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022), and that "the circumstances . . . were extreme," *State v. Schondelmeyer*, No. 14-0621,

2015 WL 1817030, at *3 (Iowa Ct. App. Apr. 22, 2015). The set of circumstances required to vacate a conviction based on *Smith* is "exceedingly rare." *State v. Atkins*, No. 20-0488, 2021 WL 3895198, at *3 (Iowa Ct. App. Sept. 1, 2021). We find such circumstances are not present here.

First, despite Hagenow's request for us to make a credibility determination, we have never permitted appellate courts to masquerade as jurors. *See State v. Garduno-Rodriguez*, No. 17-1165, 2018 WL 3057543, at *3 (Iowa Ct. App. June 20, 2018) ("We do not sit to judge the credibility of witnesses nor to reweigh the evidence."); *State v. Kissel*, No. 16-0887, 2017 WL 6032585, at *2 (Iowa Ct. App. Nov. 22, 2017) ("We thus leave the credibility determination to the jury, where it belongs."). It is not our role on appellate review "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Mathis*, 971 N.W.2d 514, 519 (Iowa 2022) (citation omitted). We similarly reserve for the jury the ability "to reject certain evidence, and credit other evidence." *Id.* at 518 (citation omitted). We therefore decline Hagenow's request for us to make such a credibility determination now.

Second, while Hagenow claims the witnesses' testimonies at times lacked particulars, this is distinguishable from the circumstances in *Smith* and *Graham*. We do not require victims of child sex abuse to recall every detail with perfect clarity, and in fact, they rarely do. *See Atkins*, 2021 WL 3895198, at *3 ("The inconsistencies raised in this appeal are of the kind commonly found in prosecutions for child sex abuse, and they do not render the substance of the testimony impossible, as was found in *Smith*."). Over an entire decade had passed

between the incidents of abuse and the eventual trial, and the temporal particulars of the offense are not required for conviction. *See id.* (finding inconsistencies in the victim's testimony "regarding the particular time and location of specific instances of abuse over the relevant time period do not preclude a conviction"). Even if some of the details are lost to time, R.H., A.H., and K.H. all detailed the same general set of facts. *See State v. Veverka*, No. 22-0255, 2023 WL 5949004, at *5 (Iowa Ct. App. Sept. 13, 2023) ("[The witness's] statements were not so inconsistent or otherwise deficient that the district court was required to find her unbelievable.").

Hagenow also asks us to require more than just the victims' testimonies to justify his convictions. While we have never required corroboration and in fact expressly reject it in our procedural rules, *see* Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."), this testimony was reinforced by other circumstantial evidence, which distinguishes it from *Graham*. 119 N.W.2d 708, 709 (where the "plaintiff's case rested upon the testimony of [the witness] alone"). Here, the State introduced the testimonies of family members, those involved in the investigations, and supporting exhibits. Their testimonies were generally consistent with one another, and a full record validates their assertions. The State admitted multiple disclosures, including a forced recantation with applicable testimony, and corroboration even among the victims, who had not shared the details of their abuse with one another. Physical evidence was unavailable given the delayed disclosure of the abuse, but it was not required. *See State v. Howland*, No. 22-0519, 2023 WL 3613259, at *1 (Iowa Ct. App. May 24, 2023) (restating victim testimony is sufficient and "need not be

corroborated by physical evidence" (citation omitted)). But none of this evidence is necessary for Hagenow's convictions.

Viewing the evidence in the light most favorable to the State, the victims' testimonies "alone [are] sufficient for conviction." *See State v. Donahue*, 957 N.W.2d 1, 10–11 (Iowa 2021). Their testimonies established a consistent pattern of sexual abuse, in stark contrast to the narratives from *Smith*. 508 N.W.2d at 103. The jury was instructed to convict Hagenow if the State proved all of the following:

> 1. On or about between January 1, 2009 and May 1, 2014, the defendant performed a sex act with [the victim].
> 2. The defendant performed this sex act while [the victim] was [the age applicable to the degree of sexual abuse charged].

The testimonies of the victims and family members establish both the occurrence of the sex acts and the timeline. The age of abuse was narrowed down based on the house in which the abuse occurred, and the jury was free to believe such testimony reflected the victim's age at the time. Further, the type of abuse was alleged by each victim, and the jury was similarly instructed to compare it to the definition of "sex act" provided in its instructions as "any sexual contact":

> 1. By penetration of the penis into the vagina or anus.
> 2. Between the mouth of one person and the genitals of another.
> 3. Between the genitals of one person and the genitals or anus of another.
> 4. Between the finger or hand of one person and the genitals or anus of another person.
> 5. By a person's use of an artificial sex organ or a substitute for a sexual organ in contact with the genitals or anus of another.

R.H.'s, A.H.'s, and K.H.'s testimonies detailed Hagenow's sexual touching of their genitals, either with his hands, penis, or mouth, and how the acts were motivated

by sexual desires. The record is replete with explicit evidence of Hagenow's intentions with his daughters, using them for his own sexual arousal and stimulation. It is not up to us to question the validity of such testimony but to consider whether sufficient evidence supported the jury's verdict. *See Mathis*, 971 N.W.2d at 519. By itself, the testimony is sufficient evidence. *See Donahue*, 957 N.W.2d at 10–11. We therefore affirm Hagenow's convictions.

### III. Pretrial Motions.

Hagenow next argues that the denial of his motions to sever the counts and for substitute counsel constituted an abuse of discretion. We consider each in turn.

*A. Denial of Motion to Sever or Bifurcate Counts.*

Early on in the proceedings, Hagenow moved to sever or bifurcate the counts into separate trials, and the district court denied his motion. We review the court's "refusal to sever multiple charges against a single defendant for abuse of discretion." *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013) (quoting *State v. Elston*, 735 N.W.2d 196, 198 (Iowa 2007)). To determine whether the counts should be separated into individual trials, we use a two-part analysis. *See Elston*, 735 N.W.2d at 198–99. We first consider whether the offenses "constitute[d] parts of a common scheme or plan" such that they should be tried together in a single trial. *See* Iowa R. of Crim. P. 2.6(1). We then balance the prejudice to the defendant against the court's interests in judicial economy. *See Romer*, 832 N.W.2d at 181–83.

Hagenow challenges the court's finding that similar acts on different victims satisfy the test for a common scheme or plan, arguing there must be some "common link" between offenses. *State v. Oetken*, 613 N.W.2d 679, 688

(Iowa 2000). To determine whether the offenses are part of a common scheme or plan, we "consider factors such as intent, modus operandi, and the temporal and geographic proximity of the crimes." *Romer*, 832 N.W.2d at 181. We also consider whether "[t]he defendant carried out similar acts in similar ways." *State v. Umana*, No. 11-0667, 2012 WL 4513859, at *6 (Iowa Ct. App. Oct. 3, 2012). The Iowa Supreme Court has found a connection between acts when they were "motivated by [a] desire to satisfy sexual desires through the victimization of children." *Elston*, 735 N.W.2d at 199. The district court found Hagenow's crimes motivated by such desires, and we agree.

Based on the evidence, Hagenow had clear sexual intentions that he turned into patterned behavior. Hagenow's relationship with the victims created an opportunity for him to isolate the children and perpetuate the abuse. *See Umana*, 2012 WL 4513859, at *6 (finding a common scheme or plan when the defendant "used his position of trust and authority" to victimize children). Further, the incidents themselves happened in the same location during the same timeframe and followed a distinct pattern. *See Elston*, 735 N.W.2d at 199 (finding a common scheme or plan when "[a]ll of the transactions allegedly occurred in close geographic proximity within the [family's] small home"). Each occasion started out as seemingly-innocent "morning cuddles" or simply snuggling in bed. He would massage or rub the child before graduating to touching the child's genitals with his hands or mouth. Then he would ask the child to touch him and attempt to manipulate them to get what he wanted. If the child did not comply, Hagenow would withhold love and attention; if she gave in, he would shower her with affection. *See Romer*, 832 N.W.2d at 182–83 (concluding a common scheme

or plan exists when the defendant "displayed a similar modus operandi with all of the minors involved" through patterned behavior across multiple victims); *see also State v. Johnson*, No. 22-1139, 2023 WL 8069231, at *4 (Iowa Ct. App. Nov. 21, 2023) (factoring the similarity of acts "starting with massages before progressing" to other sexual contact into a common-scheme analysis). Hagenow followed a distinct pattern in committing these offenses, despite having several victims. Accordingly, we find no abuse of discretion in the district court's determination that the three offenses were part of a common scheme or plan.

In the second part of the analysis, "[t]o prove the district court abused its discretion in refusing to sever charges, [the defendant] bears the burden of showing prejudice resulting from joinder outweighed the State's interest in judicial economy." *Elston*, 735 N.W.2d at 199 (citation omitted). Hagenow makes two arguments on this point: (1) prior-bad-acts evidence is inherently prejudicial and (2) the prejudice outweighs the court's interests in judicial economy.

First, Hagenow contends that our evidentiary rules prevent admission of prior-bad-acts evidence and having cumulative testimony improperly bolstered the witnesses' credibility. *See* Iowa R. Evid. 5.404(b) (preventing evidence of other acts from being admitted for propensity purposes). But Iowa courts have expressly rejected this argument over and over when considering bifurcation of counts. *See Romer*, 832 N.W.2d at 183 ("[The defendant's] only arguments in this area pertain to our evidentiary rule on propensity, which we have unequivocally established as distinct from an analysis under our law dealing with joinder of offenses."); *State v. Lam*, 391 N.W.2d 245, 250 (Iowa 1986) ("The two rules deal with different questions, making the wholesale importation of the evidentiary rule into the law

dealing with joinder of offenses inappropriate." (citation omitted)); *Johnson*, 2023 WL 8069231, at *5 (rejecting the defendant's propensity-rule argument based on *Romer* precedent); *State v. Monsoon*, No. 21-0213, 2022 WL 951179, at *1 (Iowa Ct. App. Mar. 30, 2022) ("[T]he Iowa Supreme Court has squarely rejected an Iowa Rule of Evidence 5.404(b) analysis in the formula."). To the extent that he suggests any change, we follow existing precedent and decline to sever the counts based on any prejudice resulting from prior bad acts. *See State v. Miller*, 841 N.W.2d 583, 584 n.1 (Iowa 2014) (acknowledging "it is the role of the supreme court to decide if case precedent should no longer be followed").

Hagenow then argues the prejudice outweighed the judicial economy of a single trial because each child's testimony was only necessary for their respective trial. But we disagree. R.H., A.H., and K.H.'s stories are all completely intertwined. R.H.'s first disclosure and recantation sparked questions about her sisters and eventually, led to their own disclosures to their mother. Then, R.H.'s two later disclosures resulted in A.H.'s and K.H.'s willingness to come forward. Their timelines are interconnected, which makes separation into three trials impractical if not impossible. Further, nearly every witness would testify in all three trials and their testimonies would include "the same operative facts." *Romer*, 832 N.W.2d at 183. Even if the victims did not testify to their own abuse in their sisters' trials, they would still be needed to testify to other matters, such as the timeline, Hagenow's motives and actions around the time of the abuse, and the events that sparked the disclosures. In addition, the interest in judicial economy here is especially high given that R.H. had to be flown from New Zealand for depositions

and trial. Finally, the jury was properly instructed to alleviate any potential prejudice. *See id.* (considering whether the jury "had a cautionary instruction which instructed the jury to look at each of the . . . counts separately and reach a verdict on each count separately" in undue-prejudice analysis). We therefore do not find any abuse of discretion by the court in balancing such prejudice against the high interest in keeping the counts together in a single trial.

*B. Denial of Motion for Substitute Counsel.*

Next, Hagenow contends the district court abused its discretion when denying his motion for substitute counsel. While the parties disagree on the appropriate standard of review, our review is for an abuse of discretion.[3] *See Tejeda*, 677 N.W.2d at 749. "We will only find an abuse of discretion if the trial court exercised its discretion on clearly untenable or unreasonable grounds." *State v. Petty*, 925 N.W.2d 190, 194 (Iowa 2019).

Hagenow alleges there was a breakdown in attorney-client communication and the court neglected its "duty to inquire" into that relationship. *See Tejeda*, 677 N.W.2d at 751–52. "A complete breakdown in communication between an attorney and a defendant is sufficient cause justifying the appointment of substitute counsel." *Petty*, 925 N.W.2d at 196 (citation omitted). But here the district court made a complete inquiry. While we do not require the court to "conduct a hearing every time a dissatisfied defendant lodges a complaint about

_____

[3] Hagenow claims that our review is de novo because the right to counsel is constitutional. While our review of the court's *failure* to rule on requests for substitute counsel implicates a constitutional right and is de novo, *State v. Tejeda*, 677 N.W.2d 744, 749 (Iowa 2004), the district court ruled on Hagenow's motion. We therefore review his denied request for an abuse of discretion. *See id.*

his attorney," *Tejeda*, 677 N.W.2d at 751, the court did just that. Not only did the court hold a hearing on the motion, but it deliberately went through each of Hagenow's concerns one-by-one. While it could not produce evidence that did not exist or expense inadmissible witnesses, the court resolved what issues it could. It coordinated access to certain evidence Hagenow requested and when there were concerns about getting a laptop to Hagenow, the court promised, "let's make it happen." As for Hagenow's criticisms of his attorney "neglect[ing] this particular case," the court confirmed with Hagenow's counsel that he had recently hired additional staff, which would alleviate some of the communication issues. It also made certain that Hagenow had multiple methods of contacting his trial counsel, such as phone calls, voicemail messages, and written correspondence. Finally, the court addressed the "fundamental difference" in strategy between Hagenow and his attorney. Hagenow and his attorney reached a compromise, where counsel agreed to pursue Hagenow's preferred defense strategy despite his professional reservations. The court then confirmed whether the parties were prepared for trial, and they responded affirmatively.

To the extent that Hagenow contends the court improperly denied his request for substitute counsel, we disagree. Hagenow has not met his burden in showing that new counsel is necessary based on a complete breakdown in communication. *See State v. Lopez*, 633 N.W.2d 774, 778–79 (Iowa 2001). "The court has considerable discretion whether to grant substitute counsel, and eleventh-hour requests for substitute counsel are generally disfavored." *State v. Boggs*, 741 N.W.2d 492, 506 (Iowa 2007). Moreover, we generally view such requests with suspicion when they are employed on two separate occasions mere

weeks before trial. *See Tejeda*, 677 N.W.2d at 750 ("Last-minute requests for substitute counsel, insofar as they constitute a delay tactic, are disfavored."); *see also State v. Atley*, 564 N.W.2d 817, 839 (Iowa 1997) (Lavorato, J., dissenting) (noting that judges "must be wary of defendants who employ complaints about counsel as dilatory tactics"). Most importantly, Hagenow's arguments lack merit and suggest more generally a distaste for his attorney's methods than a real communication issue. For example, Hagenow complained about his attorney's decision to use hard-copy photographs rather than create a digital slide show presentation despite Hagenow simultaneously acknowledging that was not a sufficient reason for new counsel. This issue is completely irrelevant to his trial counsel's ability to represent him. *See Lopez*, 633 N.W.2d at 781 (finding the defendant's unrelated concerns did not establish the breakdown of attorney-client communication because they "had nothing to do with defense counsel's representation"). The Iowa Supreme Court also found that a

> general frustration and dissatisfaction with defense counsel expressed by a defendant does not alone render counsel unable to perform as a zealous and effective advocate. The focus of the inquiry is not on the defendant's relationship with his or her attorney, but "the adequacy of counsel in the adversarial process." In reality, "a person accused of a crime is often genuinely unhappy with an appointed counsel who is nevertheless doing a good job." Thus, not all criticism lodged by a defendant against defense counsel requires new counsel.

*Boggs*, 741 N.W.2d at 506 (internal citations omitted). As the district court noted, "This appears to be a situation where an attorney with a busy and active practice has to attempt to try to attend to many cases and matters. [Hagenow] did not specify any issue that he ultimately was unable to discuss" with his attorney. Based on the hearing, we find much of Hagenow's frustrations involved issues with

evidence and the proceedings themselves rather than his counsel. But even still, most if not all of the issues were alleviated at the pretrial hearing. The court conducted a thorough inquiry, and the parties conveyed their apparent satisfaction and preparedness for trial before the hearing concluded. Accordingly, we find no abuse of discretion by the court. In fact, it *surpassed* its duty to address Hagenow's concerns, encourage communication with his trial counsel, provide him with largely unfettered access to evidence, secure him a laptop, and ensure the parties were ready to continue to trial.

## IV. *Disposition.*

Because sufficient evidence supports Hagenow's convictions and the district court did not abuse its discretion in denying his motions, we affirm.

**AFFIRMED.**